IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| The Ceramic Art & Culture Institute | : | |
| | : | |
| v. | : | No. 1294 C.D. 2018 |
| | : | |
| Berks County Board of Assessment Appeals and Reading School District | : | |
| | : | |
| | : | |
| Appeal of: Berks County Board of Assessment Appeals | : | |
| | : | |
| The Ceramic Art & Culture Institute | : | |
| | : | |
| v. | : | No. 1330 C.D. 2018 |
| | : | Argued: December 12, 2019 |
| The Board of Assessment Appeals of Berks County | : | |
| | : | |
| v. | : | |
| | : | |
| Reading School District, | : | |
| Appellant | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE ANNE E. COVEY, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                    FILED: February 18, 2020

The Berks County Board of Assessment Appeals and the Reading School District (collectively, School District) appeal the August 27, 2018, order of the Court of Common Pleas of Berks County (trial court) that granted The Ceramic Art & Culture Institute (Institute) a real estate tax exemption. In doing so, the trial court held that the Institute was a purely public charity by reason of its educational and cultural activities.  On appeal, the School District argues that the Institute does not satisfy the constitutional and statutory test for a purely public charity and,

alternatively, that parts of the building are not regularly used by the Institute and should be taxed. The School District further argues that the Institute does not qualify for a tax exemption under the Consolidated County Assessment Law (Assessment Law),[1] because it has only an equitable ownership of the real estate in question. Alternatively, the School District argues that the Assessment Law violates the Pennsylvania Constitution. We affirm.

**Background**

In March of 2016, Gary and April Kutay purchased a Queen Anne style home (property) at 746 Centre Avenue, Reading, which has an assessed value of $259,000. The property houses the Institute, a Pennsylvania nonprofit corporation established by the Kutays' daughter, Hollace Kutay.[2] The Institute was incorporated "exclusively for charitable, educational, and scientific purposes" with its "[m]ain [p]urpose" being an "[a]rt gallery and art institute." Reproduced Record at 108a (R.R.__). The Institute is tax exempt under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. §501(c)(3), and holds a sales and use tax exemption from the Pennsylvania Department of Revenue. The Institute provides art education to residents of the City of Reading and conducts workshops for at-risk and disadvantaged people in Berks, Lancaster, and Lebanon counties. The Institute's stated mission is "to support individual and artistic growth" and to enhance the arts in Reading by hosting nationally known artists to conduct workshops and exhibit work at the Institute's gallery. R.R. 135a.

---

[1] 53 Pa. C.S. §§8801-8868. The Assessment Law applies to second class A counties and third, fourth, fifth, sixth, seventh and eighth class counties. 53 Pa. C.S. §8801(b)(1)(i). Berks County is a third class county.

[2] The record shows that the Kutays have supported the Institute with donations, in-kind gifts and low-interest loans. Many of the loans have been repaid by the Institute's fundraising activities.

From March 2016 through December 2017, the Institute renovated the property to make it suitable for its activities. The renovations included infrastructure improvements to the heating and air conditioning system as well as carpentry, plumbing, painting and tile work throughout the house. The basement was transformed into a clay studio, furnished with a 19.2-cubic-square-foot kiln. The Institute used the property for fundraising events in October 2016, June 2017, October 2017, and June 2018.

In February 2018, the Institute began offering classes at the property. Hollace Kutay serves as the instructor without compensation. Tuition is set below the cost of the materials, kiln firing and instruction. Scholarship students do not pay tuition or for the cost of their materials. The Institute offers free workshops to nonprofit groups serving disadvantaged, at-risk, and disabled populations, as well as Boy Scout chapters in Lancaster and Berks Counties.

Hollace Kutay serves as the Institute's full-time executive director. She lives in Lancaster County and commutes daily to the Institute. She receives no salary or reimbursement for her expenses. The Institute's directors serve without compensation. The Institute has no employees and pays no salaries.

The Institute's articles of incorporation preclude the use of revenue to benefit individuals associated with the organization or "other private persons." R.R. 108a. All revenue must be used for charitable purposes. In 2016 and 2017, the Institute operated at a net loss, finishing 2017 with a deficit of $18,000.

On August 23, 2017, the Institute entered into an installment sales agreement to purchase the property from the Kutays for $360,000, which agreement was recorded the same day. Under the agreement, the Institute paid $1,000 at settlement and agreed to pay the principal balance, with four-percent interest

3

amortized for 20 years, in monthly installments of $2,175.47. The agreement further provides that a balloon payment of $216,325.76 must be remitted on August 1, 2027. In the event of a default, prior payments by the Institute are forfeited. The agreement makes the Institute responsible for payment of "any real estate taxes and water and sewer rentals and all other municipal services charges for the [property] payable for the period commencing the date of this agreement." R.R. 512a.

On August 25, 2017, the Institute applied to the Board of Assessment Appeals (Board) for a real estate tax exemption.[3] The application stated that the Institute is the "record owner" of the property and that the "[p]roperty [is] actually and regularly used by an institution of purely public charity for the purpose of … [e]ducation[] and [a]rt [g]allery[.]" R.R. 520a. The Institute's application states in relevant part, as follows:

> Land – Total Acreage  .28  Use charitable outdoor events & exhibits
>
> > Building – Basement Ceramic Teaching Facility sq. ft. 1,780
> >
> > – 1st Floor Art Gallery & Event Space sq. ft. 2,042
> >
> > – 2nd Floor Housing for director & visiting artists sq. ft. 1,640
> >
> > – Upper Floors Attic space expected to be refurbished for director living quarters sq. ft. 1,527

---

[3] In August 2016, the Kutays, as the record owners of the property, submitted a real estate tax exemption application, which contained the same information in the Institute's application. R.R. 463a. The Kutays later withdrew the application after being told that "there needed also to be legal ownership by the charitable entity." Notes of Testimony (N.T.), 8/8/2018, at 31; R.R. 379a.

4

R.R. 521a.  On November 20, 2017, the Board denied the tax exemption, and the Institute appealed.  In July and August of 2018, the trial court held a *de novo* hearing in which the School District intervened.

At the hearing, April and Hollace Kutay testified to the facts recited above.  Hollace Kutay further testified that she selected the property for the Institute because it is located in a neighborhood "in need of revitalization."  Notes of Testimony (N.T.), 7/18/2018, at 14; R.R. 27a.  The Kutays purchased the property on behalf of the Institute, contingent on the zoning hearing board's approval for "how [the Institute] wanted to use the building."  *Id*. at 12; R.R. 25a.

Hollace Kutay testified that the third floor attic space has not been converted into living quarters because the Institute cannot afford the renovation.  Lacking heat and plumbing, the attic is "not habitable" and has been used only for storing Christmas decorations.  *Id*. at 24; R.R. 37a.  No one resides at the property.  Hollace Kutay has stayed overnight on the second floor "maybe 15 to 20 times" to fire the kiln.  *Id*. at 24; R.R. 37a.  Hollace Kutay testified that the first floor of the property has been used for board meetings, and the large room on that floor is planned for gallery exhibitions open to the public.  The Institute is the sole occupant of the property.

Hollace Kutay also testified about a carriage house located behind the main house.  She explained that she has incorporated a business called "Fine Art at Centre Park," to sell ceramic artworks.  In June of 2016, she used the carriage house to display her senior thesis work from college.  However, to date, Fine Art at Centre Park has not sold any art and is "only an organization on paper."  *Id*. at 28; R.R. 41a.  The Institute has installed a pottery wheel, a kiln, and working tables in the carriage

5

house, where Hollace Kutay has created ceramics for the Institute's fundraising events. She also works with small groups of students there.

Hollace Kutay testified that she wrote to all of the elementary and middle school art teachers in the area about the Institute's classes and scholarship opportunities. She received positive responses. The Institute offered into evidence an email printout, in which an art teacher expressed gratitude that students "are getting an opportunity to work with an expert[.]" R.R. 268a. Hollace Kutay testified that scholarship students make up 50% of the enrollees and pay nothing for instruction or materials. She plans to reduce that number to 25%.

In opposition to the Institute's case, the School District presented the deed, the mortgage agreement, and the installment sales agreement, which showed that the Kutays purchased the property for $280,000 and sold it to the Institute for $360,000. The School District also presented an application for a real estate tax exemption filed by the Kutays as title owners in August 2016; the Board's denial of their application; and the Kutays' appeal of the Board's decision to the trial court. The School District argued, *inter alia*, that the Institute is a "sham" charity because it was established to generate a profit for the Kutays and to avoid real estate taxes.

**Trial Court Decision**

By order of August 27, 2018, the trial court reversed the Board, holding that the Institute is a purely public charity within the meaning of Article VIII, Section 2(a)(v) of the Pennsylvania Constitution, PA. CONST. art. VIII, §2(a)(v), and the Institutions of Purely Public Charity Act (Act 55).[4] It based this conclusion on a number of factual findings. The Institute provides art education; operates entirely free from a private profit motive; pays no salaries; charges a tuition that is

---

[4] Act of November 26, 1997, P.L. 508, 10 P.S. §§371-385.

6

insufficient to cover the costs of a student's education; and donates a substantial portion of its services to aid low-income students, who receive scholarships and pay neither for instruction nor for materials they use.

Having concluded that the Institute is a purely public charity, the trial court held that the property is exempt from real estate taxes under Section 8812(a)(3) of the Assessment Law because it has been in "absolute and sole possession" by the Institute and dedicated to its "educational functions." Trial Court Opinion, 8/27/2018, at 13. The trial court further held that Section 8812(b) of the Assessment Law allows an equitable owner of real property, such as the Institute, to qualify for a tax exemption.

## Appeal

On appeal,[5] the School District raises six issues, which we have consolidated and reordered for our analysis.[6] First, it argues that the Institute is not a purely public charity. Second, it argues that at least 75% of the property is not used by the Institute, making that portion subject to taxation under the Pennsylvania Constitution and Section 8812(a) of the Assessment Law. Third, it argues that Section 8812(b) of the Assessment Law does not allow an equitable owner of realty to qualify for an exemption; alternatively, Section 8812(b) violates the Pennsylvania Constitution. We address these issues *seriatim*.

---

[5] This Court's review determines whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by substantial evidence. *Walnut-Twelve Associates v. Board of Revision of Taxes of City of Philadelphia*, 570 A.2d 619, 622 (Pa. Cmwlth. 1990). The trial court, as fact finder, has discretion over evidentiary weight and credibility determinations. *1198 Butler Street Associates v. Board of Assessment Appeals, County of Northampton*, 946 A.2d 1131, 1138 n.7 (Pa. Cmwlth. 2008).

[6] Before this Court, the Board joined in the brief of the School District.

7

# I. Purely Public Charity

The School District argues that the trial court erred in concluding that the Institute is a purely public charity because the Institute did not satisfy the five-part test established by our Supreme Court in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 487 A.2d 1306 (Pa. 1985) (*HUP*). Likewise, it argues that the Institute did not satisfy the requirements in Act 55.

The Pennsylvania Constitution addresses real estate exemptions for charitable institutions. Article VIII, Section 2(a) states in pertinent part, as follows:

> (a) The General Assembly may by law exempt from taxation:
>
> \*\*\*
>
> > (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

PA. CONST. art. VIII, §2(a)(v). The Pennsylvania Constitution does not define an "institution of purely public charity," but our Supreme Court has filled this lacuna with what is generally known as the *HUP* test. Under the *HUP* test, a purely public charity is an institution that:

> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and

8

(e)   Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317.  In 1997, the General Assembly enacted Act 55 to "weigh[] in on questions affecting determinations of charitable exemption[.]" *Alliance Home of Carlisle, PA v. Board of Assessment Appeals*, 919 A.2d 206, 216 (Pa. 2007).  Act 55 tracks the five criteria set forth in the *HUP* test and specifies the type of evidence needed to meet each individual criterion.

This Court has explained that Act 55 codifies "the purely public charity test of *HUP*" and expounds thereon.  *Church of the Overcomer v. Delaware County Board of Assessment Appeals*, 18 A.3d 386, 392 n.4 (Pa. Cmwlth. 2011). The *HUP* test sets forth the minimum constitutional requirements for a tax exemption. Therefore, "[a]n entity seeking a statutory exemption for [sic] taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Alliance Home of Carlisle*, 919 A.2d at 222.

Guided by these principles, we consider each factor of the *HUP* test and of Act 55.[7]

## A. "Charitable Purpose"

Our Supreme Court has established that the term "charitable" includes

> every gift for a general public use, to be applied, consistent with
> existing laws, for the benefit of an indefinite number of persons,
> and designed to benefit them from an educational, religious,
> moral, physical or social standpoint.  In its broadest meaning it

---

[7] In *Church of the Overcomer*, 18 A.3d at 391, this Court held that a property owner's entitlement to a tax exemption is a mixed question of law and fact. Further, this Court will not disturb the trial court's decision absent an abuse of discretion or lack of supporting evidence. *Id.* at 388 n.1.

is understood "to refer to something done or given for the benefit of our fellows or the public."

*HUP*, 487 A.2d at 1315 (citation omitted). Notably, institutions that provide education have long been regarded as having a "charitable purpose." *City of Washington v. Board of Assessment Appeals of Washington County*, 704 A.2d 120, 123 (Pa. 1997).

Section 5(b) of Act 55 provides that to advance a charitable purpose, an institution must be organized and operated primarily to fulfill any one or more of the following purposes:

(1) Relief of poverty.

(2) *Advancement and provision of education.* This paragraph includes postsecondary education.

(3) Advancement of religion.

(4) Prevention and treatment of disease or injury, including mental retardation and mental disorders.

(5) Government or municipal purposes.

(6) *Accomplishment of a purpose which is recognized as important and beneficial to the public and which advances social, moral or physical objectives.*

10 P.S. §375(b) (emphasis added).

The trial court concluded that the Institute serves a charitable purpose under the *HUP* test and under Section 5(b) of Act 55 by providing art education to the public, particularly disadvantaged, at-risk and disabled persons. The School District does not challenge the trial court's holding in this regard. Rather, it argues that the installment sales agreement has defeated the Institute's charitable purpose because in the event of a default, any sum paid by the Institute towards the purchase

10

price of the property will be forfeited. The School District did not cite, and we did not find, any legal authority to support the proposition that an installment sales agreement, by itself, negates a charity's charitable purpose.

We conclude that the trial court did not err in holding that the Institute serves a charitable purpose under the Pennsylvania Constitution and Section 5(b) of Act 55.

## B. "Gratuitous Service"

The second prong of the *HUP* test requires the taxpayer to establish that it "[d]onates or renders gratuitously a substantial portion of its services." *HUP*, 487 A.2d at 1317. "The word 'substantial' does not imply a magical percentage. It [requires evidence] that the organization makes a bona fide effort to service primarily 'those who cannot afford the usual fee.'" *Id.* at 1315 n.9. Further, the fact that an entity charges for its services does not negate its status as a charitable institution. *St. Margaret Seneca Place v. Board of Property Assessment Appeals and Review, County of Allegheny*, 640 A.2d 380, 384 (Pa. 1994) (collection of fees is appropriate since charities need not provide services on a wholly gratuitous basis).

Act 55 provides guidance on the gratuitous donation requirement. It states:

> (d) Community service. --
>
> > (1) The institution must donate or render gratuitously a substantial portion of its services. *This criterion is satisfied if the institution benefits the community by actually providing any one of the following*:
> >
> > ***
> >
> > (iv) Financial assistance or uncompensated goods or services to at

11

least 20% of those receiving similar goods or services from the institution if at least 10% of the individuals receiving goods or services from the institution either paid no fees or fees which were 90% or less of the cost of the goods or services provided to them, after consideration of any financial assistance provided to them by the institution.

10 P.S. §375(d)(1)(iv) (emphasis added). This Court has explained that financial assistance is determined by comparing "the subsidized goods and services and the goods and services provided to full paying individuals." *Albright Care Services v. Union County Board of Assessment* (Pa. Cmwlth., Nos. 2094, 2100 C.D. 2012, filed January 29, 2014) (unreported), slip op. at 20.[8]

The School District argues that under *Nile Swim Club of Yeadon v. Delaware County Board of Assessment Appeals* (Pa. Cmwlth., Nos. 792, 836, 837 C.D. 2012, filed March 14, 2013) (unreported), the Institute's evidence did not satisfy the gratuitous service factor. We disagree.

*Nile Swim Club* involved a two-pool swim club that funded its operations with membership dues. The club presented testimony that it occasionally offered a reduced fee to the public at large; the club's officers volunteered time to help the club's operations; and the club operated at a deficit. The trial court held that the swim club's evidence was too vague, and this Court affirmed. We explained that there must be competent evidence on

---

[8] Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code §69.414(a), provides that an unreported panel decision of the Commonwealth Court, issued after January 15, 2008, may be cited for its persuasive value.

the entity's revenue, operating costs, profit, and/or deficit, and to specifically correlate this information with the value of charitable services donated or gratuitously rendered. *Although there is no magic percentage to determine what constitutes a "substantial portion" of services for purposes of the HUP test, a trial court needs an adequate evidentiary basis upon which to compare the amount of gratuitous/donated services rendered with the total value of services offered, in order to decide whether the gratuitous/donated services comprise a substantial portion of the entity's overall services.*

*Id.*, slip op. at 9-10 (emphasis added). The vague testimony offered by the swim club was held insufficient to satisfy the second prong of *HUP*.

*Nile Swim Club* is distinguishable. The trial court found that the Institute has granted scholarships to 25% of its students based on need, and they do not pay for instruction or materials. Paying students are subsidized by the Institute because their tuition does not fully cover the cost of the materials, kiln firing, or instruction. The Institute also offers workshops free of cost to disadvantaged, at-risk, and disabled populations. This record is wholly unlike that in *Nile Swim Club*, where the club "occasionally" offered a reduced fee to the public.

The Institute's financial statements and tax returns also support the trial court's conclusion in this regard. By the end of 2016, the Institute had generated income of $3,904 from "admissions, merchandise sold or services performed," but its total expenses were $55,549. R.R. 286a, 292a. Expenses included $33,033 for "[o]ccupancy, rent, utilities, and maintenance" and $18,000 for advertising, equipment, and supplies. R.R. 286a, 300a. By the end of 2017, the Institute had generated income of $18,275 from "admissions, merchandise sold or services performed"; its total expenses were $67,030, including $34,157 for "[o]ccupancy, rent, utilities, and maintenance" and $30,160 for costs relating to equipment and supplies. R.R. 302a, 308a, 319a. The tax returns showed that in 2016 the Institute

13

received $69,671 in "[c]ontributions, gifts, [and] grants" and in 2017, it received $71,817. R.R. 286a, 302a. This kind of financial detail was totally absent in *Nile Swim Club*.

The School District argues, nevertheless, that Act 55 requires "a calculation of uncompensated services rendered versus the cost of providing such services, how many classes have been held, how many attendees were in the classes, and/or which attendees paid the full fee versus a reduced fee versus no fee." School District Brief at 37. Such detail is not required by Section 5(d)(1)(iv) of Act 55, which states that the institution must provide

> [f]inancial assistance or uncompensated goods or services to at least 20% of those receiving similar goods or services from the institution if at least 10% of the individuals receiving goods or services from the institution either paid no fees or fees which were 90% or less of the cost of the goods or services provided to them.

10 P.S. §375(d)(1)(iv). The trial court found, as fact, that 25% of the Institute's students paid no fees; that the Institute also offered free workshops to nonprofit groups; and even the fees of paying students do not cover the Institute's costs to provide them instruction. In short, the Institute provides "financial assistance or uncompensated goods" to *all* students, which passes the 20% threshold in Section 5(d)(1)(iv).

We conclude that the trial court did not err in holding that the Institute satisfied the "gratuitous service" requirement under the Pennsylvania Constitution and Act 55.

### C. "Charity to Persons"

The third prong of the *HUP* test requires the public charity to benefit a substantial and indefinite class of persons who are legitimate subjects of charity.

14

*Mars Area School District v. United Presbyterian Women's Association of North America*, 693 A.2d 1002, 1007 (Pa. Cmwlth. 1997). Notably, the beneficiaries of charity need not be limited to those in financial distress. As our Supreme Court noted:

> There is no requirement [] that all of the benefits bestowed by a purely public charity go only to the financially needy…. Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of Heaven, upon the rich as well as the poor.

*City of Washington*, 704 A.2d at 125 (emphasis and internal citations and quotations omitted). In *City of Washington*, the Supreme Court held that a private four-year liberal arts college satisfied the "legitimate subject of charity" test even though scholarships were awarded not only on the basis of financial need but also on the basis of academic achievement. *Id.*

Section 5(e)(2) of Act 55 defines "legitimate subjects of charity" to mean "[t]hose individuals who are unable to provide themselves with what the institution provides for them." 10 P.S. §375(e)(2). It further defines "substantial and indefinite class of persons," in relevant part, as "[p]ersons not predetermined in number, provided that, where the goods or services are received primarily by members of the institution, membership cannot be predetermined in number and cannot be arbitrarily denied by a vote of the existing members." 10 P.S. §375(e)(2).

The School District argues that the Institute did not demonstrate that the Institute's students cannot obtain ceramic instruction "without charge, elsewhere, such as in a public school." School District Brief at 32. However, the Institute's evidence showed that ceramics instruction was not provided at the public schools in the area. Further, the Institute places "no restriction whatsoever on whom

15

may participate in the art training," and not all of its students are youths. Trial Court Opinion, 08/27/2018, at 20. Even so, persons who are financially secure "may nevertheless be 'poor' or 'needy' in relation to the outlays needed to obtain certain services in the absence of charity." *In re Sewickley Valley YMCA Decision of Board of Property Assessment*, 774 A.2d 1, 12 (Pa. Cmwlth. 2001) (quoting *Unionville-Chadds Ford School District v. Chester County Board of Assessment Appeals*, 714 A.2d 397, 400 (Pa. 1998)).

We conclude that the trial court did not err in concluding that the Institute met the "charity to persons" requirement under the Pennsylvania Constitution and Act 55.

### D. "Government Burden"

To satisfy the fourth prong of the *HUP* test, the purely public charity must relieve the government of some burden. In *In re Sewickley Valley*, 774 A.2d at 12, this Court held that a YMCA relieved the government of a burden because it gratuitously allowed school districts to use its swimming pool and athletic fields. Likewise, in *City of Washington,* the Supreme Court held that a private, four-year liberal arts college "relieves the load placed on the state-owned system of colleges and universities" by providing higher education for state residents. 704 A.2d at 125.

Section 5(f) of Act 55 provides that an institution may relieve the government of some of its burden if it

> (1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service [or]
>
> (2) Provides services in furtherance of its charitable purpose which are either the responsibility of the government by law or

16

which historically have been assumed or offered or funded by the government.

10 P.S. §375(f).

The School District argues that the trial court erred on this factor because the School District has no obligation to provide ceramics classes. Because the Institute does not grant academic credits, it did not relieve the School District of any burden.

In *Unionville-Chadds Ford*, 714 A.2d 397, our Supreme Court concluded that Longwood Gardens, a world-renowned public garden, relieved the government of some of its burden. Longwood Gardens includes an arboretum, conservatory and greenhouse complex, architectural displays, water gardens, fountains, an open air theatre, meadow and forest land, wildlife habitats, walking trails, picnic areas and a variety of educational and research facilities. The Supreme Court held that although the government does not have an obligation to provide public gardens, this is not determinative. This is because

> the government has long provided support for public parks and recreation areas *as well as for cultural institutions*, including museums, libraries, etc. Longwood's public park and cultural facilities fall clearly within the scope of burdens that are routinely shouldered by government. Hence, this element of the *HUP* test was properly found to be met.

*Id.* at 401 (emphasis added).

In *Pocono Community Theater v. Monroe County Board of Assessment Appeals*, 142 A.3d 110 (Pa. Cmwlth. 2016), this Court considered a theater that hosted community programs and events; donated marketing and theater space for educational programs; and screened first-run studio, independent, and art house films on a daily basis. This Court reasoned that the fourth prong of the *HUP* test

17

should not be construed literally. *Id*. at 116. The theater, as did Longwood Gardens, advanced a cause that the government has chosen to support. To that end, the General Assembly has established the Pennsylvania Council on the Arts, a state agency with the mission to "foster the excellence, diversity, and vitality of the arts in Pennsylvania and to broaden the availability and appreciation of those arts throughout the state." *Id*. By offering musical and theatrical performances and community art programs, the theater advanced "the government's assumed responsibility to support the arts while advancing historic preservation." *Id*. A theater is the type of "cultural institution" targeted by the Supreme Court in *Unionville-Chadds Ford*, 714 A.2d at 401.

We reject School District's narrow understanding of the "government burden" factor. As in *Unionville-Chadds Ford* and *Pocono Community Theater*, the Institute relieves the government of an assumed burden to foster the arts. It is irrelevant that the School District does not bear the specific burden to teach ceramics. The government has long provided support for cultural institutions and education in the arts. *Unionville-Chadds Ford*, 714 A.2d at 401.

We conclude that the trial court did not err in concluding that the Institute relieved the government of some of its burden under the Pennsylvania Constitution and Act 55.

### E. "Private Profit Motive"

A purely public charity must operate free of a private profit motive. Excessive salaries paid to a charity's management are inconsistent with this standard. *St. Margaret Seneca Place*, 640 A.2d at 385. Providing financial support to for-profit businesses affiliated with the charity may indicate that the "charity" does not operate free of a profit motive. *Community General Osteopathic Hospital*

18

*v. Dauphin County Board of Assessment Appeals*, 706 A.2d 383, 390 (Pa. Cmwlth. 1998). A charity's surplus, if any, must be used to operate its facility. *Id.* (quoting *West Allegheny Hospital v. Board of Property Assessment, Appeals, and Review*, 455 A.2d 1170 (Pa. 1982)).

Section 5(c) of Act 55 states that to be free from private profit motive, the purely public charity must meet all of the following:

> (1)  Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals, as the private inurement standard is interpreted under section 501(c)(3) of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. §501(c)(3)).
>
> (2)  The institution applies or reserves all revenue, including contributions, in excess of expenses in furtherance of its charitable purpose or to funding of other institutions which meet the provisions of this subsection and subsection (b).
>
> (3)  Compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution.
>
> (4)  The governing body of the institution of purely public charity has adopted as part of its articles of incorporation or, if unincorporated, other governing legal documents a provision that expressly prohibits the use of any surplus funds for private inurement to any person in the event of a sale or dissolution of the institution of purely public charity.

10 P.S. §375(c).

Here, the trial court found that the Institute operates at a net loss; pays no salary or benefits to Hollace Kutay; and does not pay fees to the board of directors. The articles of incorporation preclude the use of earnings to benefit individuals associated with the Institute or other private persons; all proceeds in

19

excess of expenses must be used for charitable purposes. On this evidence, the trial court concluded that the Institute operated free of a private profit motive in satisfaction of both the *HUP* test and Section 5(c) of Act 55.

The School District contends that the Institute is a "sham" charity that was created to profit the Kutays. They point out that the Kutays purchased the property at $280,000 and sold it to the Institute under the terms of the installment agreement for $360,000.

The trial court found otherwise. Crediting the testimony of April and Hollace Kutay, the trial court rejected the School District's suggestion that the Institute was a "shell corporation" through which the Kutays generated profit or avoided taxes. Trial Court Opinion, 8/27/2018, at 17. Notably, the School District does not challenge the trial court's credibility determinations.

We conclude that the trial court did not err in concluding that the Institute operated free of a private profit motive under the Pennsylvania Constitution and Act 55.

In summary, the trial court's findings are supported by substantial evidence. For all the above-recited reasons, we affirm the trial court's conclusion that the Institute satisfied both the constitutional requirements established in the *HUP* test and the statutory requirements in Act 55. Thus, the Institute proved that it qualified for a tax exemption as a purely public charity.

## II. Institute's Use of Property

The School District argues that even if the Institute is a purely public charity, its property is taxable to the extent it is not used for its charitable purpose. The School District argues that under the tax exemption clause of the Pennsylvania

20

Constitution and Section 8812(a) of the Assessment Law, the Institute cannot claim a total tax exemption unless it uses the entire property for its charitable purpose.

Under the Pennsylvania Constitution, a charity's tax exemption extends only to "that portion of real property of such institution which is actually and regularly used for the purposes of the institution." PA. CONST. art. VIII, §2(a)(v).[9] Section 8812(a)(3) of the Assessment Law, which formed the basis of the Institute's claim for real estate tax exemption, states as follows:

> (a) General rule.—The following property shall be exempt from all county, city, borough, town, township, road, poor, county institution district and school real estate taxes:
>
> ***

---

[9] Section 5(h) of Act 55, entitled "parcel review," likewise provides:

> (h) Parcel review.--
>
> (1) Nothing in this act shall affect, impair or hinder the responsibilities or prerogatives of the political subdivision responsible for maintaining real property assessment rolls to make a determination *whether a parcel of property or a portion of a parcel of property is being used to advance the charitable purpose of an institution of purely public charity* or to assess the parcel or part of the parcel of property as taxable based on the use of the parcel or part of the parcel for purposes other than the charitable purpose of that institution.
>
> (2) Nothing in this act shall prohibit a political subdivision from filing challenges or making determinations as to *whether a particular parcel of property is being used to advance the charitable purpose of an institution of purely public charity*.

10 P.S. §375(h) (emphasis added). Our Supreme Court has observed that although the language employed in the statute is not identical to the constitutional text, *i.e.*, where the constitutional text speaks of "used for the purposes of the institution," the statute speaks of "being used to advance the charitable purpose," "it would appear that any definitional difference is minor and, if anything, would serve to narrow the exemption, which the General Assembly is free to do." *Alliance Home of Carlisle*, 919 A.2d at 224.

(3) All hospitals, universities, colleges, seminaries, academies, associations and *institutions of learning*, *benevolence or charity*, including fire and rescue stations, with the grounds annexed and necessary for their occupancy and use, founded, endowed and maintained by the public or private charity[10] *as long as all of the following apply*:

> (i) *The entire revenue derived by the entity is applied to support the entity* and to increase the efficiency and facilities of the entity, the repair and the necessary increase of grounds and buildings of the entity and for no other purpose.
>
> (ii) *The property of purely public charities is necessary to and actually used for the principal purposes of the institution and not used in such a manner as to compete* with commercial enterprise.

53 Pa. C.S. §8812(a)(3) (emphasis added).

The School District argues that the Institute failed to satisfy Section 8812(a)(3)(i) of the Assessment Law because the Institute's revenue "is funneled to" the Kutays through the installment payments. School District Brief at 28. In addition, it argues that Fine Art at Centre Park, a for-profit entity, serves to "compete

---

[10] The School District does not argue that the Institute failed to satisfy the requirement in Section 8812(a)(3) that the Institute be "founded, endowed and maintained by the public [] charity." 53 Pa. C.S. §8812(a)(3). Notably, Act 55 provides that an institution satisfying the five criteria set forth in Section 5(b)-(f), 10 P.S. §375(b)-(f), "shall be considered to be founded, endowed and maintained by public or private charity." 10 P.S. §375(a). Because we conclude that the Institute satisfied the five criteria in Section 5(b)-(f) of Act 55, the Institute is "founded, endowed and maintained" by public charity as required by Section 8812(a)(3) of the Assessment Law. 53 Pa. C.S. §8812(a)(3).

22

with commercial enterprise," which violates Section 8812(a)(3)(ii) of the Assessment Law. *Id.*; 53 Pa. C.S. §8812(a)(3)(ii).

The trial court found that the Institute purchased the property from the Kutays and entered the transaction in good faith. Further, Hollace Kutay testified that Fine Art at Centre Park is "only an organization on paper" and not operational. N.T. 28, R.R. 41a. As such, it does not compete with commercial art galleries. Crediting Hollace Kutay's testimony, the trial court found that the Institute has been in sole possession of all the property, including the carriage house. Trial Court Opinion, 08/27/2018, at 3. The trial court's findings are supported by substantial evidence and will not be disturbed.

The School District then argues that at least a portion of the property is not exempt from real estate tax because it is not actually and regularly used for any charitable purpose of the Institute. It targets several spaces. The carriage house on the property was used to sell Hollace Kutay's ceramic works. The third floor attic of the main house has not been renovated and is not habitable. Hollace Kutay stayed overnight on the second floor of the main house to fire the kiln but did so only on "a handful of nights." N.T., 07/18/2018, at 25; R.R. 38a. The first floor of the main house, likewise, is not regularly used for the Institute's purposes. The School District argues that because only 25% of the floor space is regularly used for the Institution's charitable purpose, the remainder is taxable.

The Institute counters that the property has been under active restoration since 2016. This is sufficient to constitute regular use of the property for a charitable purpose. In any event, the Institute contends that the record established that it uses more than the basement of the house. The Institute uses the first floor for board meetings, and that floor will be open to the public as an art gallery.

Plumbing work has been done on the second floor, as the first phase of creating accommodations for visiting artists and students. Classes and fundraising have taken place in the carriage house. The Institute argues that there is no precedent for the proposition that the attic space of a property must be taxed separately if it is uninhabitable.

This Court has held that the necessity for the property to be occupied by a charitable institution is a flexible standard. Absolute necessity need not be shown. *In re City of Pittsburgh*, 977 A.2d 71, 75 (Pa. Cmwlth. 2009).[11] Nevertheless, courts will look at the "use of the property rather than any characterization of the owner or lessee or the use of the proceeds from the property" to make their determination. *Id.* at 75 (quoting *Board of Revision of Taxes of Philadelphia v. United Fund of Philadelphia Area*, 314 A.2d 530, 533 (Pa. Cmwlth. 1973)).

In *Borough of Homestead v. St. Mary Magdalen Church*, 798 A.2d 823 (Pa. Cmwlth. 2002), the borough challenged the tax exemption for an office building owned by the diocese. The diocese used the office building to assist displaced steel mill workers with a job center, which occupied 5% of the total space. The remaining space was occupied by for-profit and nonprofit entities, which helped the unemployed. The for-profit entities occupied 16% of the space, and the nonprofit entities occupied 79% of the space. The diocese provided utility services and was responsible for all maintenance. The borough argued that the diocese did not sufficiently occupy or possess the office building to qualify for an exemption under

---

[11] *In re City of Pittsburgh* concerned a trust seeking a real estate tax exemption under, *inter alia*, Section 204(a)(3) of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §5020-204(a)(3), which contains similar language as in Section 8812(a)(3) of the Consolidated County Assessment Law. 53 Pa. C.S. §8812(a)(3).

Section 204(a)(9) and 204(c) of The General County Assessment Law.[12] This Court held otherwise and affirmed the trial court's grant of an exemption.

In doing so, we distinguished *Appeal of Archdiocese of Philadelphia*, 617 A.2d 821 (Pa. Cmwlth. 1992), which also involved Section 204(c) of The General County Assessment Law. The archdiocese leased the entire building to another charitable organization. It used the garage only to park a bus and stored furniture in the basement. Given these facts, this Court held that the archdiocese did not "use" the building for its charitable purpose.

By contrast, in *St. Mary Magdalen Church*, the diocese maintained active, daily possession of the office building "with some control over all activities on the property." *St. Mary Magdalen Church*, 798 A.2d at 829. The diocese permitted other organizations to occupy space as licensees not tenants. Further, the diocese did not give up its right to control of the property, and it maintained the premises. Given these circumstances, this Court concluded that the diocese occupied the building sufficiently to allow the tax exemption.

---

[12] Section 204(a)(9) of The General County Assessment Law provides that certain property shall be exempt from taxation, specifically:

> (9) All real property owned by one or more institutions of purely public charity, used and occupied partly by such owner or owners and partly by other institutions of purely public charity, and necessary for the occupancy and enjoyment of such institutions so using it.

72 P.S. §5020-204(a)(9).
Section 204(c) of The General County Assessment Law provides:

> Except as otherwise provided in clause (10) of this section, all property, real and personal, actually and regularly used and occupied for the purposes specified in this section shall be subject to taxation, unless the person or persons, associations or corporation, so using and occupying the same, shall be seized of the legal or equitable title in the realty and possessor of the personal property absolutely.

72 P.S. §5020-204(c). Section 8812(a)(11) and 8812(b)(2) of the Consolidated County Assessment Law contains similar language. 53 Pa. C.S. §8812(a)(11), 8812(b)(2).

Here, the record evidence does not support the School District's argument that only 25% of the floor space is regularly used for the Institute's charitable purpose. The School District reads the requirement that the real property must be "actually and regularly" used for a charitable purpose as requiring constant use of every square foot of the building. This is an extreme interpretation of regular use.

Moreover, in *Senior Citizen Health Care Counsel of Erie County, Pennsylvania, Inc. v. Board of Tax Assessment Appeals of Erie County, Pennsylvania*, 678 A.2d 430, 432 (Pa. Cmwlth. 1996), this Court held that a purely public charity actually and regularly used its space simply by hiring an architect and soliciting bids for renovation. The Institute has taken steps to renovate the building, which is sufficient to show actual and regular use. However, it has done more. It offers art instruction while the renovations continue.

The trial court found that the Institute used the entire building in different ways. The basement has been converted to a studio with installment of a kiln, where most of the classes take place. The first floor has been used for board meetings and is staged for an art gallery. Plumbing work had been done in preparation of housing visiting artists on the second floor. The carriage house has been used exclusively by students and to produce ceramics for the Institute's fundraising efforts. The Institute's use of the property cannot be compared to the "minimal, passive possession" that barred the tax exemption in *Appeal of Archdiocese of Philadelphia*. As in *St. Mary Magdalen Church*, the Institute has sole possession and control of the entire property.

The trial court's findings of fact that the Institute actually and regularly uses the property are supported by the record. We affirm the trial court's conclusion

26

that the Institute satisfied the tax exemption clause of the Pennsylvania Constitution and Section 8812(a)(3) of the Assessment Law.

## III. Equitable Ownership

Finally, the School District argues that the trial court erred by holding that Section 8812(b)(2) of the Assessment Law allows for an equitable owner of real property to qualify for a tax exemption. The School District further argues that Section 8812(b)(2) violates the uniformity clause and the tax exemption clause of the Pennsylvania Constitution.

Section 8812(b)(2) of the Assessment Law states:

(b) Exceptions.--

\*\*\*

(2) Except as otherwise provided in subsection (a)(12)[13], all property, real and personal, actually

---

[13] Subsection (a)(12) provides:

(a) General rule.--The following property shall be exempt from all county, city, borough, town, township, road, poor, county institution district and school real estate taxes:

\*\*\*

(12) All playgrounds with the equipment and grounds annexed necessary for the occupancy and use of the playgrounds, founded, endowed or maintained by public or private charity which apply their revenue to the support and repair of the playgrounds and to increase the efficiency and facilities thereof, either in ground or buildings or otherwise, and for no other purpose, and owned, leased, possessed or controlled by public school boards or properly organized and duly constituted playground associations, and approved and accepted by the board of the county in which the playgrounds are situated. A school board may, by resolution, agree to pay for grading, paving, macadamizing, maintenance or improvement of streets or roads abutting land owned by the school district.

53 Pa. C.S. §8812(a)(12).

and regularly used and occupied for the purposes specified in this section shall be subject to taxation *unless the person or persons, associations or corporation so using and occupying the property shall be seized of the legal or equitable title in the realty* and possessor of the personal property absolutely.

53 Pa. C.S. §8812(b)(2) (emphasis added). Accordingly, a person with "equitable title" can qualify for a real estate tax exemption so long as the property is actually and regularly used and occupied for an exempt purpose enumerated in Section 8812(a).

When an agreement of sale is signed, the purchaser becomes the equitable owner through the doctrine of equitable conversion; the seller retains legal title only as a security against the purchase price. *DiDonato v. Reliance Standard Life Insurance Company*, 249 A.2d 327, 329 (Pa. 1969). Here, the trial court found that the Institute obtained equitable ownership of the property by entering into the installment sales agreement. Thus, it qualified for a tax exemption under Section 8812(b)(2).[14]

The School District argues that Section 8812(b)(2) is unconstitutional because it impermissibly expands Article VIII, Section 2(a)(v) of the Pennsylvania Constitution, which provides that "only that portion of real property *of such*

---

[14] On November 19, 2019, the School District filed an application with this Court to file a post-submission communication pursuant to PA. R.A.P. 2501(a), requesting this Court to take judicial notice of the post-trial sale of the real property to a third party. The School District attached a copy of the recorded deed, which shows that the Kutays and the Institute sold the property to an individual on July 21, 2019, for $374,000. The School District asserts that the deed shows that the Institute never took title to the property. However, the Institute was an equitable owner. The change in ownership does not affect the exemption before July 21, 2019. The School District's application will be denied because it is irrelevant to the School District's appeal. What happens to the property after the trial court's order of August 27, 2018, is beyond this appeal.

28

*institution*" that is actually and regularly used for a charitable purpose is exempt from taxation. PA. CONST. art. VIII, §2(a)(v) (emphasis added). The School District contends that the term "of such institution" requires a legal ownership, not equitable ownership. Otherwise, parties could circumvent the requirement that ownership and occupancy be unified "by merely entering into a written agreement titled 'installment sale agreement' instead of 'lease.'" School District Brief at 23. The Institute counters that Article VIII, Section 2(a)(v) of the Pennsylvania Constitution does not use the term "owner" or "ownership." Institute Brief at 30.

Allowing an equitable owner to obtain a tax exemption does not expand the scope of Article VIII, Section 2(a)(v). Further, whether a particular sales agreement is a "sham" requires a factual determination to be made by the trial court. In the instant case, the trial court credited the testimony of April and Hollace Kutay to find that the parties entered into the sales agreement in good faith. As fact finder, the trial court is required to evaluate the witnesses, their demeanor and make necessary credibility determinations, which cannot be disturbed on appeal. *Finney v. Department of Transportation, Bureau of Driver Licensing*, 721 A.2d 420, 423 (Pa. Cmwlth. 1998). Notably, the School District does not challenge the trial court's credibility determinations.

The School District further contends that Section 8812(b)(2) violates the uniformity clause of the Pennsylvania Constitution, which provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art. VIII, §1. The School District argues that Section 8812(b)(2) provides "preferential tax treatment to equitable property owners that lack legal title to the property." School District Brief at 25. We disagree.

29

The principles governing the validity of tax classifications are well established. We evaluate challenges based on the uniformity and equal protection standards in the same manner:

> Under the equal protection clause, and under the Uniformity Clause, absolute equality and perfect uniformity in taxation are not required. In cases where the validity of a classification for tax purposes is challenged, the test is whether the classification is based upon some legitimate distinction between the classes that provides a non-arbitrary and "reasonable and just" basis for the difference in treatment. Stated alternatively, the focus of judicial review is upon whether there can be discerned "some concrete justification" for treating the relevant group of taxpayers as members of distinguishable classes subject to different tax burdens. When there exists no legitimate distinction between the classes, and, thus, the tax scheme imposes substantially unequal tax burdens upon persons otherwise similarly situated, the tax is unconstitutional.

*City of Harrisburg v. School District of City of Harrisburg*, 710 A.2d 49, 53 (Pa. 1998) (citations omitted).

Neither the uniformity clause nor the tax exemption clause of the Pennsylvania Constitution distinguishes between legal and equitable title. Section 8812(b)(2) of the Assessment Law treats legal and equitable owners of realty the same, or, uniformly. We reject the School District's uniformity clause argument.

## Conclusion

For all of the foregoing reasons, we hold that the Institute proved that it is a purely public charity under the constitutional requirements in the *HUP* test and under the statutory requirements in Act 55. The record established that the Institute has regularly and actually used the property to advance its charitable purpose in satisfaction of the tax exemption clause of the Pennsylvania Constitution

30

and Section 8812(a)(3) of the Assessment Law. We also hold that the Institute, as equitable owner of the property, may qualify for a tax exemption under Section 8812(b)(2) of the Assessment Law, which does not violate the uniformity clause and the tax exemption clause of the Pennsylvania Constitution.

We affirm the trial court's order of August 27, 2018.

_____
MARY HANNAH LEAVITT, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| The Ceramic Art & Culture Institute | : | |
| | : | |
| v. | : | No. 1294 C.D. 2018 |
| | : | |
| Berks County Board of Assessment Appeals and Reading School District | : | |
| | : | |
| Appeal of: Berks County Board of Assessment Appeals | : | |
| | : | |
| The Ceramic Art & Culture Institute | : | |
| | : | |
| v. | : | No. 1330 C.D. 2018 |
| | : | |
| The Board of Assessment Appeals of Berks County | : | |
| | : | |
| v. | : | |
| | : | |
| Reading School District, | : | |
| Appellant | : | |

# **O R D E R**


AND NOW, this 18th day of February, 2020, the order of the Court of Common Pleas of Berks County, in the above-captioned matter, is AFFIRMED. Appellant Reading School District's application to file a post-submission communication pursuant to Pennsylvania Rule of Appellate Procedure 2501(a) is DENIED.

MARY HANNAH LEAVITT, President Judge