714 A.2d 397

**UNIONVILLE–CHADDS FORD SCHOOL DISTRICT, Appellant,**

**v.**

**CHESTER COUNTY BOARD OF ASSESSMENT APPEALS and Longwood Gardens, Inc., Appellees.**

Supreme Court of Pennsylvania.

Argued Feb. 2, 1998.

Decided July 20, 1998.

Ira Weiss, Pittsburgh, for Unionville Chadds Ford School District.

Thomas L. Whiteman, West Chester, for Chester Co. Board of Assessment.

Thomas A. Riley, Jr., Paoli, Harry J. Rubin, York, for Longwood Gardens.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This is an appeal by allowance from an order of the Commonwealth Court which affirmed an order of the Court of Common Pleas of Chester County upholding a decision of the Chester County Board of Assessment Appeals exempting property owned by Longwood Gardens, Inc. (Longwood) from real estate tax. The appellant, Unionville–Chadds Ford School District, challenges Longwood's exemption from tax. At issue is whether Longwood can claim exemption as a purely public charity.

Longwood is a very large and world-renowned public garden located in Chester County, just outside of the Philadelphia area. It comprises 1,050 acres, approximately 422 of which are within the appellant school district. Pierre du Pont acquired Longwood in the early 1900s and developed its then-existing arboretum into extensive park-like gardens. The gardens have been open to the public since the 1920s and have been under the control of a non-profit operating foundation since 1970. More than 800,000 visitors per year make use of the gardens. The property was originally part of lands owned by William Penn and is listed in the U.S. Department of the Interior's National Register of Historic Places.

Longwood features an expansive arboretum where trees and shrubs are cultivated, immaculate flower gardens, collections of rare plants, a huge conservatory and greenhouse complex, architectural displays, a water garden, fountains, an open air theater for the performing arts, managed meadow and forest lands, wetlands, wildlife habitats, walking trails, picnic areas, and a variety of educational and research facili-

ties. Included in the latter are an auditorium, classrooms, a library, exhibit areas, and scientific facilities. Also present are a restaurant, which is provided for the convenience of visitors, and a shop that sells garden-related items.

Longwood serves as a site for hundreds of cultural events every year. For example, in 1994 alone, more than 450 performing arts events were held there. Longwood also maintains and funds highly regarded educational and research programs related to horticulture. These include a university-affiliated graduate program and various internships, as well as workshops, lectures, and advisory services. In addition, Longwood makes contributions of money, property, and services to the surrounding community. These have included a picnic area for the public, more than $2 million for local road improvements, substantial cash donations to schools and the local fire department and rescue squad, and making Longwood's facilities available to other charitable organizations at cost. Longwood is operated in heavy reliance on endowment funds, inasmuch as its operating expenses far exceed its revenues.

The courts below and the board of assessment appeals upheld Longwood's tax-exempt status under the General County Assessment Law, 72 P.S. § 5020–204(a)(3), which provides that "[a]ll ... institutions of learning, benevolence, or charity, ... with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity" shall be exempt from all county, city, borough, town, township, road, poor, and school taxes. This exemption was enacted pursuant to a provision of the Pennsylvania Constitution which gives the legislature power to exempt from taxation real property used by "[i]nstitutions of *purely public charity* ...." Pa. Const. art. VIII, § 2(a)(v) (emphasis added). At issue in this appeal is whether Longwood meets the constitutional prerequisite of being a "purely public charity" so that it can claim the statutory exemption.[1]

---

**1.** Appellant does not challenge Longwood's statutory exemption under 72 P.S. § 5020–204(a)(3) as an institution of learning, benevolence, or

In *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*), we set forth a test that determines whether an entity constitutes a purely public charity. The test requires that the entity (1) advance a charitable purpose; (2) donate or render gratuitously a substantial portion of its services; (3) benefit a substantial and indefinite class of persons who are legitimate subjects of charity; (4) relieve the government of some of its burden; and (5) operate entirely free from private profit motive. *Id.* at 21–22, 487 A.2d at 1317. Whether an institution is one of purely public charity is a mixed question of law and fact on which the trial court's decision is binding absent an abuse of discretion or lack of supporting evidence. *G.D.L. Plaza v. Council Rock School District,* 515 Pa. 54, 59, 526 A.2d 1173, 1175 (1987). Here, the record amply supports the trial court's determination that Longwood is a purely public charity.

We granted allowance of appeal to review Longwood's compliance with elements three and four of the *HUP* test. Nevertheless, a brief background as to Longwood's compliance with the other elements of the test is in order.

As to the first element, the school district stipulated at trial that Longwood advances a charitable purpose,[2] and this was construed by the trial court as including public use of the park-like grounds as well as educational and research activities. The second element, requiring that a substantial portion of services be rendered gratuitously, is satisfied in that Longwood absorbs a major portion of the cost of providing the public with the use of its grounds, facilities, and programs. Admission fees and other user charges cover only about 56% of operating costs. Hence, payment of the remaining 44% of costs is provided gratuitously by Longwood. Were it not for Longwood's willingness to absorb these costs, the price of

charity; hence, the issue in this appeal is confined to whether Longwood satisfies the constitutional requirement of being a purely public charity. In view of our disposition of this issue, we do not reach the question of whether Longwood could instead qualify for exemption as a public park under 72 P.S. § 5020–204(a)(6).

**2.** N.T. 5/3/95 at 114.

admission would have to be raised to $22 per person. Longwood instead charges only $10 for adults, except on certain days when admission is free to all, and at all other times offers deeply discounted or free admission to many groups, including children, nursing home residents, and the disadvantaged. Further, as heretofore described, Longwood makes substantial donations to the surrounding community. The final element of the *HUP* test, requiring that there be no profit motivation, is also satisfied. Longwood has operated at a substantial loss for many years and its existence rests on subsidies from its endowment funds. For example, in 1994 alone Longwood sustained a loss of nearly $8 million which was later recovered from its endowment, and the historic and anticipated future losses provide no evidence of profit-seeking design.[3] Admission fees charged to the public are intentionally maintained at a level below what would be required to cover costs, much less make a profit, and operations are run by a non-profit foundation governed by an uncompensated board of trustees.

We turn now to the factors in the *HUP* test that were the basis for granting allowance of appeal. The third prong of the test requires that Longwood benefit a substantial and indefinite class of persons who are legitimate subjects of charity. Appellant contends that legitimate subjects of charity consist only of the poor, the infirm, and the needy. It is asserted that the general public cannot be a subject of charity because such a class of beneficiaries would not be limited to those who are incapacitated or financially distressed. We do not agree.

Certainly, it is common for purely public charities to benefit the infirm or needy. See generally *HUP*, 507 Pa. at 22–23,

---

**3.** Total operating revenue was $10,112,260, and expenses were $17,-976,697. Admission charges accounted for only $5,356,341 of the operating revenue, and other user charges made up the balance. Admission charges, therefore, covered only 29.8% of operating costs. The restaurant that is provided for the convenience of visitors incurred a loss of $22,381, on revenues of $1,936,944 and expenses of $1,959,325. The gift shop had a gain of $1,021,943, on revenues of $2,021,250 and expenses of $999,307, and this gain was used to offset the operating expenses of Longwood.

487 A.2d at 1317 ("the genre of the poor, incapacitated, distressed or needy"); *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review*, 536 Pa. 478, 487, 640 A.2d 380, 384 (1994) ("people who 'cannot afford to pay' "). However, as stated in our recent decision in *City of Washington v. Board of Assessment Appeals*, 550 Pa. 175, 704 A.2d 120 (1997), the beneficiaries of charity need not be limited to those who are in distress:

> There is no requirement, however, that all of the benefits bestowed by a purely public charity go *only* to the financially needy. See *Price v. Maxwell*, 28 Pa. [23] at 34 ("Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of Heaven, upon the rich as well as the poor.") See also *Presbyterian Homes Tax Exemption Case*, 428 Pa. [145] at 152, 236 A.2d [776] at 779–80 (charity can benefit both rich and poor); *Donohugh's Appeal*, 86 Pa. 306 (1878) (library constituted a charity that benefited all persons without regard to economic status).

704 A.2d at 125 (emphasis in original).

In *City of Washington*, the charitable status of a private college was upheld notwithstanding the fact that beneficiaries of its aid programs included many students who were not incapacitated or destitute. *Id.* at 124–25. A significant factor was that, in the absence of the institution's benevolence, the fees that would prevail for users of the institution's services might exceed levels that would be affordable. *Id.* at 124. Such is the case with Longwood. As earlier described, admission fees would have to be raised drastically if support from the charitable endowment were eliminated. Further, a facility as large and multi-faceted as Longwood is a unique resource that virtually no individual could afford to maintain on his or her own. It is in this regard comparable to a public library, museum, or art gallery. Such institutions have qualified as purely public charities notwithstanding the fact that many, indeed probably most, of their visitors are not incapacitated or poor. *Donohugh's Appeal*, 86 Pa. 306 (1878) (public library);

*Barnes Foundation v. Keely,* 314 Pa. 112, 116–17, 171 A. 267, 268 (1934) (public art gallery and arboretum).

■ Thus, a purely public charity can provide members of the general public with resources that would not otherwise be within their financial reach. See *City of Washington,* 704 A.2d at 124 (persons who are financially secure may nevertheless be "poor" in relation to the outlays needed to obtain certain services in the absence of charity). See also *HUP,* 507 Pa. at 19 n. 9, 487 A.2d at 1315 n. 9 (purely public charities must serve those who would not otherwise be able to afford the full fees). Were it not for the high quality public park grounds and educational and research facilities that are subsidized by Longwood, many would not be able to afford the fees that would prevail for access to comparable resources, if, in fact, such resources could be found at all.

■ Further, it is fully consistent with the fundamental character of a purely public charity to benefit the general public. As stated in *Donohugh's Appeal,* 86 Pa. at 313 (emphasis added), an essential feature of public charity "is that it is not confined to privileged individuals, but is open to the indefinite public. It is this *indefinite* or unrestricted quality that gives it its public character." See also *Episcopal Academy v. Philadelphia,* 150 Pa. 565, 573, 25 A. 55, 56 (1892) (beneficiary of a purely public charity is the public).

■ To satisfy the fourth prong of the *HUP* test, it is necessary that Longwood relieve the government of some of its burden. Appellant contends that the government has no duty to provide the public with a facility like Longwood, and, thus, that Longwood does not provide relief from any governmental burden. We do not agree. The fact that there is no constitutional or statutory duty to provide public gardens and educational and research facilities exactly like the ones at Longwood is not determinative.

Whenever the government provides services and facilities to its citizens, it bears certain burdens. Such burdens exist regardless of whether the governmental endeavor is obligatory or discretionary in origin. If services and facilities provid-

ed by government experience reduced demands due to the existence of independent institutions that meet the same needs, then it can fairly be said that the government's burden has been eased. See *City of Washington*, 704 A.2d at 125 (Where the Commonwealth assumes a responsibility for providing a service to its residents, e.g., higher education, independent institutions that provide the same service will ease the government's burden.).

The government has routinely assumed a responsibility for providing open space for public recreation and for conservation of natural landscapes and resources, as well as for providing cultural assets. The Commonwealth has, in fact, established a wide-ranging assortment of parks, recreation areas, and cultural facilities throughout the state.[4]

In this regard, the Pennsylvania Constitution declares that the people have a right to "the preservation of the natural, scenic, historic and esthetic values of the environment" and imposes on the Commonwealth a duty to conserve and maintain the public natural resources. Pa. Const. art. I, § 27. Accordingly, the Commonwealth has enacted numerous pieces of legislation to protect these resources. E.g., Recreational Improvement and Rehabilitation Act, 32 P.S. § 5401 et seq. (providing for development and rehabilitation of public recreation areas, parks, wildlife habitats, and historic or open space areas); Wild Resource Conservation Act, 32 P.S. § 5301 et seq. (providing for preservation of wild plants); Keystone Recreation, Park and Conservation Fund Act, 32 P.S. § 2011 et seq. (funding state and community parks and recreation areas, nature preserves, wildlife habitats, and historic sites). In addition, the Commonwealth provides an extensive system of state parks. See 32 P.S. §§ 821–1193.

In short, the government has long provided support for public parks and recreation areas as well as for cultural institutions, including museums, libraries, etc. Longwood's public park and cultural facilities fall clearly within the scope

4. As the trial court noted, the Commonwealth has established various parks and museums in the region of Longwood and many of these, as is the case with Longwood, charge admission fees.

of burdens that are routinely shouldered by government. Hence, this element of the *HUP* test was properly found to be met.

The trial court did not err, therefore, in concluding that Longwood qualifies as a purely public charity. The Commonwealth Court properly affirmed.

Order affirmed.

NIGRO, J., files a dissenting opinion.

NIGRO, Justice, dissenting.

Today the majority continues down a slippery slope ending in enabling most, if not all, of the non-profit corporations of this Commonwealth to obtain an exemption from real estate taxes. This decision opens the door for all private corporations that offer something of aesthetic or cultural value to the public—including museums of art, history and science, as well as musical and theatrical endeavors—to claim a real estate tax exemption. As expressed in my dissent in *City of Washington v. Bd. of Assessment Appeals,* 704 A.2d 120 (Pa.1997), the *HUP* test should instead be applied to reinforce the traditional characteristics of charities rather than expand their scope to the point that the term charity is meaningless.

As established by the Court in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985), an element of a purely public charity is that it relieves the government of some of its burden. The test for whether an entity relieves the government of some of its burden "is whether the institution bears a substantial burden that would otherwise fall to the government." *St. Margaret Seneca Place v. Bd. of Property Assessment,* 536 Pa. 478, 487, 640 A.2d 380, 385 (1994). In *St. Margaret Seneca Place,* the Court found that a nursing home met this requirement where the trial court found that but for the nursing home, patients whose costs were not fully covered by Medicaid would have to be cared for in county-provided facilities.

In contrast, the majority cites no evidence of record supporting that Longwood Gardens bears a burden that would

otherwise fall upon the government. The Commonwealth's duty to conserve public natural resources under the Constitution and the related legislation upon which the majority relies, do not establish that an extensive, private horticultural facility like Longwood Gardens relieves the government of a burden. Simply because the Commonwealth protects its own resources and provides certain services to the public, does not mean it has assumed an unlimited obligation.[1]

Like many other attractions throughout this Commonwealth, I have visited Longwood Gardens and appreciate the aesthetic and cultural value of the gardens, open air theater, and other facilities. However, the private foundation's decision to provide these services to the public for a fee should not entail an exemption from real estate taxes for the 422 acres at issue. For these reasons, I dissent.

---

1. Certainly, the government has assumed an obligation to provide some cultural activities to the public. The government, however, chooses the cultural endeavors it will pursue and its burden ends there. Thus, private corporations that decide to operate their own cultural enterprises are not relieving the government of a burden that would otherwise fall upon it.