# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Misingwa Land Trust, | : | **CASES CONSOLIDATED** |
| Appellant | : | |
| | : | |
| v. | : | Nos. 944 and 1162-1169 C.D. 2023 |
| | : | Argued: November 6, 2025 |
| Board of Commissioners of the County | : | |
| of Beaver, Sitting as the Beaver County | : | |
| Board of Assessment Revision; Beaver | : | |
| County; South Beaver Township; | : | |
| Darlington Township; and Blackhawk | : | |
| School District | : | |

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                    FILED: June 17, 2026

Misingwa Land Trust (Land Trust) appeals the orders of the Court of Common Pleas of Beaver County (trial court) that denied its application for a real estate tax exemption as a purely public charity. The trial court held that the Land Trust, established for the conservation of land and preservation of historic resources, did not demonstrate that it was a purely public charity within the meaning of Article VIII, Section 2(a)(v) of the Pennsylvania Constitution and, thus, tax exempt. PA. CONST. art. VIII, §2(a)(v).[1] On appeal, the Land Trust argues that the trial court erred because the record evidence, which was not rebutted, demonstrated compliance with each of the constitutional and statutory requirements for a tax exemption as a purely public charity. Concluding that the trial court erred in its application of the constitutional standards for a purely public charity, we vacate its

---

[1] The full text of this provision of the Pennsylvania Constitution is set forth, *infra*, in the body of the opinion.

orders and remand for further proceedings, consistent with this opinion, on both the constitutional and statutory requirements for a tax exemption.

## Background

At issue are seven parcels of land located in the Blackhawk School District (School District) in Beaver County (County). Parcel Nos. 77-120-0100.P00, 77-120-0100.N00, and 77-120-103.001 are located in South Beaver Township; Parcel Nos. 58-120-0117.P00, 58-120-0117.N00, 58-120-0118.000, and 58-120-0118.001 are located in Darlington Township (collectively, Properties). In size, each parcel ranges from 16 to 100 acres, and they consist of vacant woodlands, with the exception of one building, a former industrial brick plant, located on Parcel No. 58-120-0118.001. Portions of the Properties are enrolled in the "Clean and Green" program[2] and have qualified for preferential assessments under the Pennsylvania Farmland and Forest Land Assessment Act of 1974.[3] The Land Trust acquired the Properties between May 2020 and September 2021.

The Land Trust is a Pennsylvania nonprofit corporation established for the purposes of "conservation and preservation of lands having historical significance or [that] constitute an open space or natural area and to promote same to the general public providing access to and disseminating information about the

---

[2] Notably, Parcel Nos. 58-120-0117.P00 and 58-120-0117.N00 share the same boundaries, with the "P00" designation being the "Clean and Green" parcel of the bounded property. Likewise, Parcel Nos. 77-120-0100.P00 and 77-120-0100.N00 share the same boundaries, with the "P00" designation being the "Clean and Green" parcel of the bounded property.

[3] Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §§5490.1-5490.13 (commonly referred to as "Act 319" or "Clean and Green Act"), which established the Clean and Green program. Preferential assessments apply to land devoted to agricultural use, agricultural reserve, or forest reserve. Section 3(a) of Act 319, 72 P.S. §5490.3(a). Roll-back taxes may be due "for a change in use of the land, a change in ownership of a portion of the land, or any type of division or conveyance of the land." Section 4(c) of Act 319, 72 P.S. §5490.4(c).

land." Articles of Incorporation, ¶11; Reproduced Record at 383 (R.R. __).[4] The Articles of Incorporation preclude the corporation's officers and directors from realizing a pecuniary benefit from Land Trust operations. Articles of Incorporation, ¶14; R.R. 384. The Land Trust has been granted an exemption from federal taxation under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. §501(c)(3). In the event of a dissolution of the corporation, the assets of the Land Trust must be distributed to another Section 501(c)(3) nonprofit organization. Articles of Incorporation, ¶16; R.R. 385.

In its "Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code," *i.e.*, Form 1023, the Land Trust described its purpose as follows:

> The purpose of [the Land Trust] is to identify, preserve, and, when needed, remediate lands of historical significance that were inhabited and used by American Indian cultures from the Adena and Hopewell cultures through the Eastern Woodland tribes and nations until 1800.
>
> These goals will be accomplished through public and private fundraising activities that will allow [the Land Trust] to acquire lands in and around Western Pennsylvania and Eastern Ohio. It is anticipated that remediation of blighted lands will be accomplished through partnership with regional universities, as well as with conservation organizations that work in remediation and historical preservation.

R.R. 460.

In 2021, the Land Trust petitioned the Beaver County Board of Assessment Revision (Board of Assessment) for a real estate tax exemption for the

---

[4] Pennsylvania Rule of Appellate Procedure 2173 requires the pages of the reproduced record to be separately numbered with Arabic figures followed by a small "a." *See* Pa.R.A.P. 2173. This opinion uses the pagination as it appears in the reproduced record filed with this Court.

3

Properties, beginning with the 2022 tax year. By orders dated January 4, 2022, and February 2, 2022, the Board of Assessment denied the petitions. The Land Trust filed nine appeals to the trial court.[5] The trial court consolidated the appeals for a *de novo* trial.

At the evidentiary hearing on February 10, 2023, the Land Trust president, Thomas Keiser, II (Keiser), testified. He explained that he and his father, Thomas Keiser, Sr., the incorporators of the Land Trust, serve without compensation. In addition to the Properties at issue, the Land Trust owns another property located in Lawrence County, Pennsylvania. The Properties are located near state game lands that are intersected by the North County Trail that stretches from Maine to North Dakota. Two community parks, Darlington Park and Sahli Park, are close to the Properties.

Keiser testified that the Properties "are historically significant" because they served as hunting grounds for the Native American tribes that had once inhabited the area. Notes of Testimony, 2/10/2023, at 58 (N.T. ___); R.R. 152. Keiser testified that a "notable" "turkey [hunting] camp" of Tanaghrisson, a Seneca chief, "was located along the north fork of the Little Beaver [River] in this immediate area." N.T. 58-59; R.R. 152. The camp was located at or near the brick plant located on Parcel No. 58-120-0118.001. Keiser testified that the Native American activity along the fork of the Little Beaver River involved notable historic persons and events.

---

[5] It appears that several of these appeals were filed in duplicate. *See* R.R. 34, 47, 112, 123 (Petition for Allowance of Appeal, Docket No. 10154-2022, and Petition for Allowance of Appeal, Docket No. 10219-2022, both related to Parcel No. 58-120-0118.000; Petition for Allowance of Appeal, Docket No. 10151-2022, and Petition for Allowance of Appeal, Docket No. 10220-2022, both related to Parcel No. 58-120-0118.001). In short, the nine appeals concern seven parcels.

When asked whether the Land Trust had "hired a historian or historical entity" to evaluate the historical significance of the Properties, Keiser testified that both he and his father, who has experience serving on the board of the Little Beaver Historical Society, did the research. N.T. 60; R.R. 152. Keiser explained that the precise location of Native American camps or villages can be definitively established only by archeological research because these camps were "never limited just to a square[]" but, rather, were located "up and down the fork of the Little Beaver." N.T. 61; R.R. 153.

Keiser testified that when the Land Trust acquired Parcel No. 58-120-0118.001, the brick plant thereon was "decrepit, partially falling down." N.T. 25; R.R. 144. In early 2021, the Land Trust hired Unis Excavation to demolish the building, but the project was halted by the Pennsylvania Department of Environmental Protection when it "identified various hazardous toxic materials" at the site. N.T. 57; R.R. 152. The Land Trust then engaged an environmental engineering firm, which advised seeking a federal, brownfields grant.[6] It also advised that the Beaver County Redevelopment Authority (Redevelopment Authority) was "a much more viable candidate" to receive a brownfields grant. N.T. 69; R.R. 155. Accordingly, in November of 2022, the Land Trust entered into an agreement with the Redevelopment Authority, in which it transferred three parcels to the Authority for the environmental remediation.[7] Upon completion, the

---

[6] A "brownfield site" is real property for which the expansion, redevelopment, or reuse "may be complicated by the presence of a hazardous substance, pollutant or contaminant." 42 U.S.C. §9601(39)(A). The Environmental Protection Agency's (EPA) Brownfields Program "provides grants and technical assistance to communities, states, tribes and others to assess, safely clean up" and sustainably reuse contaminated properties. *See* https://www.epa.gov/brownfields (last visited June 17, 2026).

[7] According to a questionnaire for hazardous sites filled out for "EPA Region 3 Brownfields Assessment Grant," the affected parcels, which had been first developed as a woolen mill in the

Redevelopment Authority will return the parcels to the Land Trust. The Redevelopment Authority has received the brownfields funding, and the remediation efforts are underway.

Keiser testified that the Land Trust intends to remediate the Properties and develop "partnerships with regional universities" for forestry programs. N.T. 62; R.R. 153. In the meantime, Keiser and his family members have been clearing the Properties of trash and debris. His father spends at least two days a week working on site, and Keiser does so at least one day a week. N.T. 41; R.R. 148. Once the remediation of the Properties is completed, the Land Trust will apply for conservation grants.

Keiser stressed that the Land Trust's primary purpose is the conservation of natural green space. Keiser acknowledged that there are no marked trails, restrooms, or signage on the Properties. Rather, the "orientation" of the Land Trust is "far more toward the conservation element" than "the creation of a park[.]" N.T. 32; R.R. 145. Keiser explained as follows:

> [W]e have consistently said that our primary purpose is the conservation, protection of land and respective resources, so that is the driving factor in what we do. *And so this, relative to any of the subjects related to public access or something, it's, I use the term "incidental" is how I think of it. It's that people have been on there and people go on there, and that is, that has been fine. And it's really about the fact that regardless of whether they're walking a trail or walking their dog or doing any activity on there, they're benefitting from the proximity of it whether it's driving or walking past or breathing the air that comes from it. That or being in the water that borders it.*

---

1800s and later used for brick manufacturing through the 1900s, were found to contain "[m]etals contamination in soil and possible lead-based paint and asbestos in remaining building materials[.]" R.R. 472-73.

6

N.T. 93; R.R. 161 (emphasis added). In sum, open space preservation, not athletic recreation, is the Land Trust's purpose.

The Land Trust introduced evidence that the lands owned by Wild Waterways Conservancy and Independence Conservancy are tax exempt. Keiser testified that those organizations, which are private, nonprofit corporations dedicated to land conservation, are indistinguishable from the Land Trust. He based this opinion on his review of those organizations' websites.

Charles Potter, Jr., the Land Trust's tax attorney, also testified. He prepared and filed the Land Trust's Form 990, "Return of Organization Exempt from Income Tax," with the Internal Revenue Service for the tax years of 2020 and 2021. The Land Trust's Form 990 for 2020 showed "contributions and grants" in a total amount of $1,062,051. R.R. 478. Potter explained that Keiser's father, Thomas Keiser, Sr., "put cash into the organization to purchase land," and the former owner of some of the Properties "made a $500,000 gift to the trust." N.T. 100-01; R.R. 162-63. The Form 990 for 2021 showed "contributions and grants" to the Land Trust of $122,357; the next year "the organization acquired $175,648 of land and spent $42,000 clearing the land for its preservation program during tax year 2021." R.R. 509-10.

No evidence was presented by the County, South Beaver Township, Darlington Township, or the School District.

**Trial Court Decision**

By orders of July 31, 2023, the trial court affirmed the Board of Assessment, holding that the Land Trust did not prove that it was a purely public charity within the meaning of the Pennsylvania Constitution because it did not satisfy all five parts of the test established by our Supreme Court in *Hospital*

7

*Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985) (*HUP*). The trial court concluded that the Land Trust established that it donates or renders gratuitously a substantial portion of its services and that it operates entirely free of a private profit motive. However, the Land Trust did not prove that it advances a charitable purpose; benefits a substantial and indefinite class of persons who are legitimate subjects of charity; and did not relieve the government of some of its burden. Trial Court Op. at 17.

The trial court began with the proposition that a charitable purpose requires a "general public use[.]" Trial Court Op. at 8. The trial court found that the evidence established that the Land Trust has three "distinct [] purposes: (1) preservation of lands with historical significance; (2) conservation of natural green spaces; and (3) provision of natural green spaces for public use." *Id*. at 9. The trial court acknowledged that each purpose "could be deemed charitable on its face" but that the word "charitable" implicated the other *HUP* factors, in particular, the requirement to "benefit 'a substantial and indefinite class of persons.'" *Id*. at 9-10 (quoting *HUP*, 487 A.2d at 1317). Accordingly, the trial court's analysis treated these two *HUP* factors as one.

Acknowledging that the Properties are open to the public free of charge, the trial court found that the Land Trust "failed to establish that members of the public use the land in significant numbers[.]" Trial Court Op. at 11. Absent signage or a public service announcement that the Properties were open to the public, "a law-abiding citizen would have to assume that it would constitute trespassing to enter upon the land." *Id*. As a consequence, "the land seems to function essentially as a private park for enjoyment of [the Land Trust's] principals and their families, with the general public left in the dark as to its existence." *Id*. Absent evidence of use of

8

its lands in "significant numbers" by members of the public, the Land Trust did not advance a charitable purpose or benefit an indefinite class of persons. *Id*.

As to relief of a government burden, the trial court acknowledged that "[t]he government has routinely assumed a responsibility for providing open space for public recreation and for conservation of natural landscapes and resources[.]" Trial Court Op. at 14 (quoting *Unionville-Chadds Ford School District v. Chester County Board of Assessment Appeals*, 714 A.2d 397, 401 (Pa. 1998) (*Appeal of Longwood Gardens*)). However, after the Land Trust discovered toxins at the brick plant, it stopped the demolition and turned the matter over to the government. This action "serves as a serious blight on any argument" that the Land Trust has relieved the government of some of its burdens. Trial Court Op. at 15. Further, while the government has the burden of conserving green space, "it also has the competing burden of fostering commercial and industrial development." *Id*. at 16. The trial court questioned the value of preventing the Properties "from being put back to the industrial use they are legally zoned for." *Id*. In any case, the County already has state game lands and "other parks in the area" where the Properties are located. *Id*. For these reasons, the trial court concluded that the Land Trust did not relieve the government of some of its burden.

The Land Trust appealed to this Court.

## Appeal

On appeal,[8] the Land Trust raises two questions for our review:

---

[8] This Court's review determines whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by substantial evidence. *Walnut-Twelve Associates v. Board of Revision of Taxes of City of Philadelphia*, 570 A.2d 619, 622 (Pa. Cmwlth. 1990). "The trial court, as fact finder, has discretion over evidentiary weight and credibility determinations." *1198 Butler Street Associates v. Board of Assessment Appeals, County of Northampton*, 946 A.2d 1131, 1138 n.7 (Pa. Cmwlth. 2008).

1. Whether the Trial Court erred in determining that [the Land Trust's] use of its property did not qualify for a property tax exemption under the [*HUP* test], as the property: did not have a "charitable purpose"; failed to "benefit a substantial and indefinite class of persons"; and did not "relieve the government of some of its burden."

2. Whether the Trial Court erred in failing to hold that the subject property of [the Land Trust] failed to meet the standard for a tax exemption under the Institutions of Purely Public Charity Act.[9]

Land Trust Brief at 7.

**Tax Exemption for a Purely Public Charity**

We begin with a review of the applicable legal principles.

The Pennsylvania Constitution authorizes tax exemptions for charitable institutions. It states in pertinent part, as follows:

> (a) The General Assembly may by law exempt from taxation:
>
> . . . .
>
>> (v) Institutions of purely public charity, but in the case of any real property tax exemptions *only that portion of real property of such institution which is actually and regularly used for the purposes of the institution*.

PA. CONST. art. VIII, §2(a)(v) (emphasis added).[10] Thus, where a portion of the charity's real property is used to operate a profitable business unrelated to the

---

[9] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§371-385 (Act 55).

[10] Accordingly, Section 8812(a)(11) of the Consolidated County Assessment Law provides as follows:

> (a) General rule.--The following property shall be exempt from all county, city, borough, town, township, road, poor, county institution district and school real estate taxes:
>
> . . . .
>
>> (11) *All real property owned by one or more institutions of purely public charity, used and occupied partly by the owner or owners and partly by*

10

charity's "purposes," that portion may not be able to claim a real property tax exemption. Only the "portion of real property" that is used "for the purposes of the institution" can be exempted from taxation.

The Pennsylvania Constitution does not define "institutions of purely public charity," but our Supreme Court has filled this lacuna with what is generally known as the *HUP* test. This test provides that a purely public charity is an institution that:

> (a)  Advances a charitable purpose;
>
> (b)  Donates or renders gratuitously a substantial portion of its services;
>
> (c)  Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d)  Relieves the government of some of its burden; and
>
> (e)  Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317. The taxpayer bears the burden of establishing "each of these elements." *In re Coatesville Area School District*, 280 A.3d 1152, 1159 (Pa. Cmwlth. 2022) (*Coatesville Area School District*). "Whether an entity qualifies as a 'purely public charity' under the *HUP* test 'is a mixed question of law and fact[.]'"

---

*other institutions of purely public charity and necessary for the occupancy and use of the institutions so using it.*

53 Pa. C.S. §8812(a)(11) (emphasis added). The Consolidated County Assessment Law applies to Pennsylvania counties of the second class A, third, fourth, fifth, sixth, seventh and eighth classes. 53 Pa. C.S. §8801(b)(1)(i). Beaver County is a fourth class county.

In *Ceramic Art & Culture Institute v. Berks County Board of Assessment Appeals*, 227 A.3d 46, 61 (Pa. Cmwlth 2020), a school district sought, in the alternative, to limit the public charity's real property exemption to 25%, the amount of space "actually and regularly used for any charitable purpose of the Institute." We rejected this apportionment, noting, *inter alia*, that occupancy is a "flexible standard" that does not require the charity to occupy "every square foot of the building." *Id*. at 62-63.

11

*Id*. (quoting *Fayette Resources, Inc. v. Fayette County Board of Assessment Appeals*, 107 A.3d 839, 845 (Pa. Cmwlth. 2014)).

In 1997, the General Assembly enacted the Institutions of Purely Public Charity Act, commonly known as Act 55. This statute "weigh[s] in on questions affecting determinations of charitable exemption[.]" *Alliance Home of Carlisle, PA v. Board of Assessment Appeals*, 919 A.2d 206, 216 (Pa. 2007) (*Alliance Home of Carlisle*). This Court has explained that Act 55 codifies "the purely public charity test of *HUP*" and elaborates thereon. *Church of the Overcomer v. Delaware County Board of Assessment Appeals Premises: 1010 Sunset Street, Trainer Borough Folio No. 46-00-00563-00*, 18 A.3d 386, 392 n.4 (Pa. Cmwlth. 2011). A taxpayer seeking an exemption from taxation must first establish that it is a "purely public charity" under the Pennsylvania Constitution and, next, address the statutory requirements in Act 55 for a tax exemption. *Alliance Home of Carlisle*, 919 A.2d at 222.

Here, the trial court did not address whether the Land Trust qualified for an exemption under Act 55 because it concluded that the Land Trust failed the *HUP* test: it did not prove advancement of a charitable purpose; a benefit to a substantial and indefinite class of persons who are legitimate subjects of charity; or relief of some of the government's burden. Trial Court Op. at 17.

The Land Trust contends that its evidence demonstrated compliance with all constitutional factors and, likewise, all the statutory factors set forth in Act 55. Indeed, no contrary evidence was presented. We consider the three constitutional factors relevant to this appeal: charitable purpose, benefit to an indefinite class of persons, and relief of government burden.

12

**Pennsylvania Constitution Tax Exemption for a Purely Public Charity**
**I. Charitable Purpose**

The Land Trust argues that it is well recognized that a land conservancy advances a charitable purpose, the first constitutional prerequisite for a purely public charity. *HUP*, 487 A.2d at 1317. The Land Trust takes issue with the trial court's "minimization of the historical significance" of the Properties because no contrary evidence was presented by the County or the School District. Land Trust Brief at 24. The Land Trust also explains that a taxpayer can advance a charitable purpose while the charity is still in the development phase. For example, in *Senior Citizen Health Care Council of Erie County, Pennsylvania, Inc. v. Board of Tax Assessment Appeals of Erie County, Pennsylvania*, 678 A.2d 430 (Pa. Cmwlth. 1996) (*Senior Citizen Health Care Council*), a nonprofit senior citizen center qualified for a real estate tax exemption while its property was undergoing renovations in advance of the center's opening. This Court held that preparatory work satisfied the "occupancy" requirement in The General County Assessment Law.[11] *Id*. at 431-32. Specifically, "when a charity is constructing facilities, that charity is 'using' its property for charitable purposes[.]" *Overmont Corporation v. Board of Tax Revision of City of Philadelphia*, 388 A.2d 311, 312 (Pa. 1978).

---

[11] Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §§5020-1–5020-602. Section 204(a)(9) provides:

> (a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:
>
> . . . .
>
>> (9) All real property owned by one or more institutions of purely public charity, used and occupied partly by such owner or owners and partly by other institutions of purely public charity, and necessary for the occupancy and enjoyment of such institutions so using it[.]

72 P.S. §5020-204(a)(9).

In response, the School District argues that the trial court did not err in concluding that the Land Trust did not prove that it was advancing a charitable purpose. The Properties have remained essentially the same since their acquisition by the Land Trust. Keiser's opinion on the historic value of the Properties was not supported by third-party analysis or an academic study. The School District acknowledges that this Court has held that the preservation and maintenance of an historic structure constitutes a charitable purpose. However, in *Coatesville Area School District*, 280 A.3d 1152, the property in question was listed on the National Register of Historic Places and located in the city's historic overlay district. The Land Trust's Properties do not meet either description.

Prior to the *HUP* decision, our Supreme Court addressed the meaning of "charitable" as follows:

> The word "charitable" in a legal sense includes *every gift for a general public use*, to be applied consistent with existing laws, for the benefit of an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint. In its broadest meaning it is understood "to refer to something done or given for the benefit of our fellows or the public."

*In re Hill School*, 87 A.2d 259, 262 (Pa. 1952) (quoting *Taylor v. Hoag*, 116 A. 826 (Pa. 1922)) (emphasis added). In *HUP*, 487 A.2d at 1315, our Supreme Court drew on this quoted discussion to devise its five-part test for determining whether a taxpayer can qualify for an exemption as a purely public charity. The General Assembly has provided direct guidance on the meaning of a "charitable purpose." The Solicitation of Funds for Charitable Purposes Act (Charitable Purposes Act)[12] defines a "charitable purpose" as "[a]ny benevolent, educational, philanthropic,

---

[12] Act of December 19, 1990, P.L. 1200, *as amended*, 10 P.S. §§162.1-162.23.

14

*humane*, scientific, patriotic, social welfare or advocacy, public health, *environmental conservation*, civic or other eleemosynary objective[.]" Section 3 of the Charitable Purposes Act, 10 P.S. §162.3 (emphasis added). Stated otherwise, an animal shelter may be said to advance a charitable purpose because it serves a "humane" or "moral" objective, *i.e.*, a "general public use." *In re Hill School*, 87 A.2d at 262 (quotation omitted); Section 3 of the Charitable Purposes Act, 10 P.S. §162.3.

Our holding in *Coatesville Area School District*, 280 A.3d 1152, is instructive. At issue there was a 3.88-acre parcel with a brick building that had served as the headquarters of the first producer of boiler plate in the United States. In 2000, the parcel was conveyed to Huston Properties, a nonprofit corporation registered in Pennsylvania, in compliance with Section 501(c)(2) of the Internal Revenue Code, 26 U.S.C. §501(c)(2), and a subsidiary of the Stewart Huston Charitable Trust (Trust), a Section 501(c)(3) corporation. Huston Properties leased the building to a variety of tenants, but its rental income did not cover operating expenses. The school district challenged the tax exemption granted by the trial court, arguing, *inter alia*, that Huston Properties did not have a charitable purpose. It argued that the land preservation did not advance a charitable purpose and, further, the actual purpose of Huston Properties was to generate revenue for its parent, the Trust.

We rejected the school district's argument. First, we reasoned that the preservation of the building and land was consistent with the values enshrined in the Pennsylvania Environmental Rights Amendment to the Pennsylvania Constitution.

15

PA. CONST. art. I, §27.[13] Second, we found that by reason of the History Code[14] "[i]t is a matter of express public policy that such values include the 'architectural . . . and cultural heritage' of the Commonwealth." *Coatesville Area School District*, 280 A.3d at 1160 (quoting 37 Pa. C.S. §102). Thus, we held that Huston Properties advanced a charitable purpose, notwithstanding its use of the historic building as a rental property.

The Land Trust's Form 1023, filed with the federal government, states that its purpose is to "identify, preserve, and, when needed, remediate lands of historical significance that were inhabited and used by American Indian cultures from the Adena and Hopewell cultures through the Eastern Woodland tribes and nations until 1800." R.R. 460. The Land Trust's incorporation documents recite its intention to conserve "open space or natural area" while "providing access to and disseminating information about the land." Articles of Incorporation, ¶11; R.R. 383. The trial court failed to evaluate the Land Trust purposes in light of the values enshrined in the Environmental Rights Amendment, the History Code, or the Charitable Purposes Act, as this Court directed in *Coatesville Area School District*. Instead, the trial court conflated the "charitable purpose" factor with the factor that requires a benefit to "a substantial and an indefinite class of persons."[15] However,

_____

[13] It states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, §27.

[14] 37 Pa. C.S. §§101-906.

[15] In treating "charitable purpose" as inextricably entwined with "benefit 'a substantial and indefinite class of persons,'" Trial Court Op. at 9-10 (quoting *HUP*, 487 A.2d at 1317), the trial court cited the Supreme Court's historical review of the single word "charitable" in *HUP*, 487

16

they are separate and distinct factors, *HUP*, 487 A.2d at 1317, and each "element" requires a separate evaluation. *Coatesville Area School District*, 280 A.3d at 1159.

The trial court erred in its understanding of the charitable purpose inquiry by omitting any consideration of the values enshrined in the Environmental Rights Amendment to the Pennsylvania Constitution or expressed in the History Code and Charitable Purposes Act.[16] It also erred by merging the charitable purpose factor into another *HUP* factor, which effectively eliminated the charitable purpose factor. We reject the trial court's conclusion that the Land Trust does not advance a charitable purpose for the stated reason that it did not satisfy a separate factor in the *HUP* test.

## II. Benefit to a Substantial and Indefinite Class of Persons

The *HUP* test requires the public charity to benefit "a substantial and indefinite class of persons who are legitimate subjects of charity[.]" *HUP*, 487 A.2d at 1317. The Land Trust contends that it satisfies this criterion because it allows any member of the public to enter onto the Properties free of charge, a fact acknowledged

---

A.2d at 1315, which it used to lay the foundation for the five-part *HUP* test. However, the Supreme Court then separated the "charitable purpose" inquiry from the "benefit a substantial and indefinite class of persons" inquiry. *HUP*, 487 A.2d at 1317. The trial court erred in merging the first and third *HUP* test factors.

[16] The School District argued before the trial court that the Land Trust's deeds were required to recite their preservation use. The trial court did not base its conclusion on this contention and correctly so. There are different ways to establish a charity, and the precedent does not dictate a particular model. A charity can be established in a lease, as in *Berks County Board of Assessment and Revision of Taxes v. Berks County Conservancy*, 517 A.2d 572 (Pa. Cmwlth. 1986) (*Berks County Conservancy*). In *Coatesville Area School District*, 280 A.3d 1152, the charity was established in the deed, which was held by a nonprofit corporation that, itself, was not a charity. Longwood Gardens was established by Pierre Samuel du Pont as a trust. Thereafter, the trust lands were transferred to Longwood Gardens, Inc., a nonprofit corporation that owns and maintains the gardens. *Unionville-Chadds Ford School District v. Chester County Board of Assessment Appeals*, 692 A.2d 1136, 1137 (Pa. Cmwlth. 1997) *(Longwood Gardens I)*. The Land Trust follows the Longwood Gardens model.

17

by the trial court. The Land Trust explains that "[a]n essential feature of public charity is that it is not confined to privileged individuals but is open to the indefinite public." Land Trust Brief at 24. No evidence was presented that the Land Trust serves only "privileged individuals."

The School District contends that the Land Trust's testimony established only incidental use of the Properties by members of the public. It agrees with the trial court that the public use of the Properties "remains mostly theoretical." School District Brief at 14 (quoting Trial Court Op. at 11).

To begin, the indefinite public benefit factor does not require that the beneficiaries be persons in financial distress. As our Supreme Court noted:

> There is no requirement [] that all of the benefits bestowed by a purely public charity go only to the financially needy. *Price v. Maxwell*, 28 Pa. [23,] 34 [(1857)] ("Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of Heaven, upon the rich as well as the poor.")[.]

*City of Washington v. Board of Assessment Appeals of Washington County*, 704 A.2d 120, 125 (Pa. 1997) (emphasis omitted). In *City of Washington*, the Supreme Court held that a private four-year liberal arts college satisfied the "legitimate subjects of charity" test even though scholarships were awarded not only on the basis of financial need but also on the basis of academic achievement. *Id*. at 124. Persons who are financially secure may nevertheless be "'poor' in relation to the financial outlays" needed to realize certain services in the absence of charity. *Id*. "Thus, a purely public charity can provide members of the general public with resources that would not otherwise be within their financial reach." *Appeal of Longwood Gardens*, 714 A.2d at 400. "[A]n essential feature of public charity 'is that it is not confined

18

to privileged individuals, but is open to the indefinite public. *It is this indefinite or unrestricted quality* that gives it its public character.'" *Id*. at 401 (emphasis added) (quoting *Appeal of Donohugh*, 86 Pa. 306, 313 (1878)).

In holding that the Land Trust did not benefit a substantial and indefinite class of persons, the trial court relied upon *Berks County Conservancy*, 517 A.2d 572. This case concerned real property leased to an ornithological club for a nominal fee under an agreement providing that the premises were to be used "as a public recreational area." *Id*. at 574. In holding that this provision in the lease entitled the property owner to a tax exception, the lower court found, as fact, that "the public makes considerable use" of the leased land at "no charge." *Id*. at 575 (quotation omitted). On review, this Court rejected the lower court's factual finding, explaining as follows:

> Turning next to the issue of public use of and access to the subject properties, the trial court found as fact that, "[t]he public makes considerable use of the Alsace Property at no charge." [] *Support in the record for this finding is sketchy at best and consists largely of testimony by the Conservancy's Executive Director that he noticed trash and tire tracks during several visits to the properties*. [] *The record also establishes that the subject properties are posted with at least fifty to sixty "No Trespassing" signs*. []
>
> . . . .
>
> *We believe that the practice of posting the subject properties with "No Trespassing" signs must draw into doubt the assertion that they are being "actually and regularly used" to benefit the general public as a public recreational area*.

*Id*. (emphasis added) (internal citations omitted). In short, this Court concluded that substantial evidence did not support the lower court's factual finding that the public made "considerable use" of the "recreational area" provided in the lease. Rather,

19

the evidence established that the conservancy functioned as a private club for birdwatchers. Posting 50 or 60 "no trespassing" signs on the property was fatal to the conservancy's claim that it was providing a benefit to the "general public as a public recreational area." *Id*.

Here, drawing on *Berks County Conservancy*, the trial court opined that absent postings on the Properties that they are open to the general public, a "law abiding citizen" would consider it "trespassing to enter upon the land." Trial Court Op. at 11. This is backwards. It is a notice against trespassing that requires "posting." *See* 18 Pa. C.S. §3503(b)(1)(ii)-(iv) (a person commits trespass if he "enters or remains in any place as to which *notice against trespass is given* by . . . (ii) *posting* . . . ; (iii) fencing . . . ; [or] (iv) notices posted in a manner prescribed by law or reasonably likely to come to the person's attention[.]" (emphasis added)); *Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981) (setting aside summary trespass convictions of persons distributing anti-war pamphlets on college campus for lack of notice). In any case, neither the trial court nor the School District has cited any precedent to support the proposition that signage or other advertising is required to establish that conservancy land is available for public access.

The precedent holds that actual and repeated public entry to a conservancy is not necessary to satisfy the indefinite public benefit factor. In *Coatesville Area School District*, 280 A.3d at 1157, we considered whether a property required to "be used as a site of an office building and otherwise only for purposes consistent with the preservation and conservation of said tract of land as a historic structure" satisfied the indefinite public benefit factor. (Quotation omitted). Huston Properties leased the building to multiple tenants, including nonprofit entities, such as a community band and a museum. This Court rejected the school

20

district's argument that the taxpayer did not establish the substantial and indefinite public benefit factor because there was insufficient use of the property by members of the public. In rejecting this argument, this Court stated:

> *On the contrary, our Supreme Court has not made public entry into a building a litmus test, but rather requires that the benefit be available to the public at large.* Further, Huston's preservation and maintenance activities are a resource to the general public that, like Longwood Gardens, would not be within the means of a private individual. The trial court found that the maintenance and preservation of the [p]roperty would not be within the resources of the general public. [] *As stated by our Supreme Court, "an essential feature of public charity 'is that it is not confined to privileged individuals*[ ] *but is open to the indefinite public. It is this indefinite or unrestricted quality that gives it its public character.'"* Appeal of Longwood Gardens, 714 A.2d at 401 [(quoting *Donohugh's Appeal*, 86 Pa. [at] 313 [] (emphasis supplied))]; *compare Sacred Heart Healthcare Sys*[*tem*] *v. Commonwealth*, 673 A.2d 1021 (Pa. Cmwlth. 1996) (provision of management services to only a small group of affiliated corporations and not to the general public or any segment thereof is not a charitable purpose).

*Coatesville Area School District*, 280 A.3d at 1161-62 (emphasis added) (internal citation omitted). Further, there was no evidence that this resource would benefit "only a small group of affiliated corporations" or other like persons. *Id*. at 1162. In sum, the indefinite public benefit factor requires the charity's land "be available to the public at large," not regular and actual "public entry." *Id*. at 1161.

Here, the trial court acknowledged that members of the public "who might use the [P]roperties for recreational activities such as hiking and the general enjoyment of nature would constitute 'a substantial and indefinite class of persons who are legitimate subjects of charity.'" Trial Court Op. at 11. However, because the Land Trust had no intention of creating a "public park," such as Longwood

Gardens, with "walking trails, picnic areas, and a variety of educational and research facilities," the Land Trust did not benefit an indefinite class of persons. *Id*. at 14 (quoting *Appeal of Longwood Gardens*, 714 A.2d at 398). The trial court's robust construction of "public park" lacks merit; a facility on the scale of Longwood Gardens is not required. Indeed, in *Longwood Gardens I*, 692 A.2d at 1144, this Court stated the "public park exemption requires that the property be held for public benefit without profit[,]" a requirement met here by the Land Trust.

In *Appeal of Longwood Gardens*, 714 A.2d 397, the sole issue before the Supreme Court was whether Longwood Gardens benefited a substantial and indefinite class of persons who are legitimate subjects of charity. Our Supreme Court concluded that it did, reasoning as follows:

> [A] facility as large and multi-faceted as Longwood is a unique resource that virtually no individual could afford to maintain on his or her own. It is in this regard comparable to a public library, museum, or art gallery. Such institutions have qualified as purely public charities *notwithstanding the fact that many, indeed probably most, of their visitors are not incapacitated or poor*. []

> Thus, a purely public charity can provide members of the general public with resources that would not otherwise be within their financial reach. []

*Id.* at 400 (citations omitted) (emphasis added). As the Supreme Court explained, "virtually no individual could afford to" create or maintain Longwood Gardens. *Id*.

Likewise, few individuals could afford to buy or maintain over 100 acres of woodlands in Beaver County for the benefit of the public. Critical to this *HUP* factor is the absence of any evidence that use of the Properties would be "confined to privileged individuals." *Id.* at 401. In *HUP*, 487 A.2d 1306, for example, the putative charity collected patient treatment and cost data for hospitals. Because the beneficiaries of the Hospital Utilization Project were hospitals, the

22

taxpayer did not demonstrate a benefit to an indefinite class of persons. To the contrary, hospitals constituted an identifiable class of persons, quite distinct from the public at large.

Here, the trial court stated that the Properties seem "to function essentially as a private park for the enjoyment of [the Land Trust's] principals and their families, with the general public left in the dark as to its existence." Trial Court Op. at 11. There are several flaws in this statement.

First, the record does not support the trial court's suggestion that the Properties function as a "private park." The testimony of Keiser was credited because it was relied upon by the trial court throughout its opinion. That testimony established that Keiser and his father were doing the work of clearance and for no compensation. Such labor does not support a "private park" inference. Second, the trial court's theory that a charity requires a certain level of human use was based upon *Berks County Conservancy*, which has nothing to say about the *HUP* test. Rather, it concerned the General County Assessment Law.[17] In any case, *Coatesville Area School District*, 280 A.3d at 1161, established that it is *availability* "to the

_____

[17] *Berks County Conservancy* has limited precedential value because it did not consider the *HUP* test but, rather, the General County Assessment Law:

> In the instant case, we need not address the issue of whether the Conservancy and/or Baird constitute "purely public charities" since we conclude that the subject properties do not satisfy the requirements for use and occupancy set forth in Section 204 of the [General County Assessment] Law, 72 P.S. §5020-204.

*Berks County Conservancy*, 517 A.2d at 574. Notably, this decision has been refined by *Senior Citizen Health Care Council*, 678 A.2d 430.

Even so, *Berks County Conservancy* is distinguishable. The Land Trust has not posted "no trespassing" signs. The language relied upon by the trial court, *i.e.*, that public use is "sketchy a[t] best," Trial Court Op. at 11, related to the finding of the lower court in *Berks County Conservancy* that there was "considerable public use" of the Conservancy. *Berks County Conservancy*, 517 A.2d at 575. By contrast, in this appeal, substantial evidence is not an issue.

23

public at large[,]" not a certain level of public entry, that satisfies the indefinite public benefit factor.

The Land Trust did not have to demonstrate a certain level or type of recreational use, such as the establishment of hiking trails, in order to satisfy the indefinite public benefit factor in the *HUP* test. The trial court held otherwise, relying, erroneously, on *Berks County Conservancy*, 517 A.2d 572, a case that concerned the "use and occupancy" requirements set forth in Section 204 of the General County Assessment Law, 72 P.S. §5020-204, and, thus, not relevant to the *HUP* test. We also reject the trial court's statement that the Land Trust "seems to essentially function as a private park for the enjoyment of [the Land Trust's] principals and their families[]" because it lacks any foundation in the record. Trial Court Op. at 11. However, the central flaw in the trial court's analysis is that it gave no consideration to the principle confirmed in *Coatesville Area School District*, 280 A.3d at 1161, that it is availability of the benefit to members of the public, not actual "entry" by them, that is central to the *HUP* requirement that a public charity benefit a substantial and indefinite class of persons. We reject the trial court's conclusion on this factor.

### III. Relief of Government Burden

The Land Trust argues that it has relieved the government of some of its burden because the government routinely assumes responsibility for providing green spaces for citizens. By acquiring and preserving natural landscapes, the Land Trust has shouldered a recognized governmental burden. Further, the Land Trust has made "enormous efforts" toward "getting the [remediation] project off the ground," including its hire of an excavation company to demolish the brick plant and an environmental engineering firm to assist with the remediation. Land Trust Brief

24

at 26. Nevertheless, the Land Trust acknowledges that the Redevelopment Authority's ownership of some of the parcels "may impact the time periods of an exemption[,]" Land Trust Brief at 25, because the Redevelopment Authority will re-deed the parcels back to the Land Trust after remediation.

The School District responds that the Land Trust does not relieve the government of any burden. The toxic brick plant will be removed by the Redevelopment Authority. The School District accepts the proposition that the establishment of a public park satisfies the relief of the government burden factor, but it contends that the Land Trust has not opened a public park.

It is beyond peradventure that a purely public charity must relieve the government of some of its burden. However, our Supreme Court has clarified that this element of the *HUP* test does not require a constitutional or statutory duty imposed on a state or local government. Rather, it is enough that

> the *government has long provided support for public parks and recreation areas as well as for cultural institutions*, including museums, libraries, etc. Longwood's public park and cultural facilities fall clearly within the scope of burdens that are routinely shouldered by government. Hence, this element of the *HUP* test was properly found to be met.

*Appeal of Longwood Gardens*, 714 A.2d at 401 (emphasis added). Further, the Environmental Rights Amendment declares that "[t]he people have a right to . . . the preservation of the natural, scenic, historic and esthetic values of the environment[,]" which requires the government to conserve and maintain the public natural resources. PA. CONST. art. I, §27.

Although the trial court acknowledged that conservation of natural landscapes and historic resources is a recognized government burden, it concluded that the Land Trust Properties do not function as a "public park[.]" Trial Court Op.

25

at 15. The trial court further observed that the County already provides open space and did not need assistance on that burden. The trial court's rationale misses the mark for several reasons.

To begin with, the statute commonly referred to as the Open Space Lands Act[18] expressly authorizes local governments to condemn land to "acquire land for open space uses." Section 1 of the Open Space Lands Act, 32 P.S. §5001. Pennsylvania's governments, at every level, are engaged in land conservation and the preservation of open space. The Environmental Rights Amendment requires "public natural resources" to be conserved and maintained. PA. CONST. art. I, §27. There is no public policy that favors a limit on such undertakings. A "public park" on the scale of Longwood Gardens is not the only way for a conservancy to relieve the government of its burden. Indeed, the protection of "scenic areas for public visual enjoyment" is a recognized government function. Section 5(a)(5) of the Open Space Lands Act, 32 P.S. §5005(a)(5).

We reject the trial court's suggestion that government might prefer putting the Properties to another use, *i.e.*, the industrial use for which it is zoned. A zoning ordinance cannot be construed as a comprehensive plan for future land use. Zoning regulation limits where a particular use, particularly a high-impact industrial use, such as a steel mill, can be located so as to protect other uses, such as residences and public parks, from those impacts. It does not mean that only industry should take place in that zoning district. Indeed, Section 603(f) of the Pennsylvania

---

[18] Act of January 19, 1968, P.L. (1967) 992, *as amended*, 32 P.S. §§5001-5013. Section 5 of the Open Space Lands Act authorizes local governments to acquire, by gift or condemnation, real property "to protect," *inter alia*, "natural or scenic resources;" "scenic areas for public visual enjoyment from public rights of way;" "sites of historic geologic or botanic interest;" and to "limit the use of real property so as to achieve open space benefits[.]" 32 P.S. §5005(a)(4), (5), (6), and (8).

26

Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10603(f), provides that forestry must be allowed in every zoning district.

Likewise, the trial court's complaint "that there was no evidence presented in this case that there was a dearth of green space or outdoor recreational space in the area of the [Land Trust Properties] or in Beaver County generally[]" is irrelevant. Trial Court Op. at 16. Whether an applicant is a purely private charity does not turn on whether the local government has failed in some respect. In any case, the Land Trust's evidentiary burden did not include proving a negative, *i.e.*, that Beaver County did not have sufficient green space. The trial court's ruminations on this factor nowhere fit the constitutional parameters laid out by our Supreme Court in *HUP*, 487 A.2d 1306.

We reject the trial court's conclusion that the Land Trust does not relieve the government of some of its burden as not supported by the precedent on this *HUP* factor or the Environmental Rights Amendment to the Pennsylvania Constitution.

**Conclusion**

The trial court erred in its understanding and application of the *HUP* test relating to charitable purpose, benefit to a substantial and indefinite class of persons, and relief of some of the government's burden. We remand the matters for a new holding on each of these three factors that is consistent with the analysis set forth herein. We also direct the trial court to address the Act 55 requirements for a tax exemption, regardless of its holding on the constitutional requirements.

The trial court's central concern with the Land Trust's exemption appeal was that it did not present evidence of use in significant numbers or on efforts to provide "information about the land" available to members of the public. Articles

27

of Incorporation, ¶11; R.R. at 383. It is unclear that the *HUP* test requires that availability of the charity's resources to the public at large must be paired with advertisement of those resources or at what level. Nevertheless, because the Land Trust's evidence did not address how members of the public can learn that the Properties are available to them and considering the passage of time as well as the transfer of some of the Properties to the Redevelopment Authority, a remand for additional evidence on these matters is appropriate. We caution that availability of the charity's benefit is not synonymous with a certain level or type of use by people, as explained herein. *See, e.g.*, Section 5 of the Open Space Lands Act, 32 P.S. §5005. Further, the toxins discovered on some of the Land Trust parcels may have affected the advisability of disseminating information about the Properties to members of the public as would the remediation of the brownfield properties by the Redevelopment Authority.

Thus, we remand the matters to the trial court to take additional evidence and to issue a new decision on whether the Land Trust satisfies the constitutional prerequisites of a "purely public charity" under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution, PA. CONST. art. VIII, §2(a)(v), and the statutory requirements for a charitable exemption set forth in the Consolidated County Assessment Law, 53 Pa. C.S. §§8801-8868.

_____

MARY HANNAH LEAVITT, President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Misingwa Land Trust, | : | **CASES CONSOLIDATED** |
| Appellant | : | |
| | : | |
| v. | : | Nos. 944 and 1162-1169 C.D. 2023 |
| | : | |
| Board of Commissioners of the County | : | |
| of Beaver, Sitting as the Beaver County | : | |
| Board of Assessment Revision; Beaver | : | |
| County; South Beaver Township; | : | |
| Darlington Township; and Blackhawk | : | |
| School District | : | |

# O R D E R

AND NOW, this 17th day of June, 2026, the orders of the Court of Common Pleas of Beaver County, dated July 31, 2023, in the above-captioned matters, are VACATED, and the matters are REMANDED for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge Emerita